872

COMMONWEALTH OF MASSACHU-
SETTS et al., and Conservation Law
Foundation of New England, Inc., et al.,
Plaintiffs, Appellees,

v.

Cecil D. ANDRUS et al., Defendants,
Appellants,

Atlantic Richfield Company et
al., Intervenors.

COMMONWEALTH OF MASSACHU-
SETTS et al., and Conservation Law
Foundation of New England, Inc., et al.,
Plaintiffs, Appellees,

v.

Cecil D. ANDRUS et al., Defendants,

Atlantic Richfield Company et al.,
Intervenors, Appellants.

Nos. 78–1036, 78–1037.

United States Court of Appeals,
First Circuit.

Argued March 7, 1978.

Decided Feb. 20, 1979.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, MURRAY, District Judge.\*

Peter R. Steenland, Jr., Atty., Dept. of Justice, Washington, D.C., with whom James W. Moorman, Asst. Atty. Gen., John J. Zimmerman, Bruce C. Rashkow, Irwin L. Schroeder, and William B. Morrison, Attys., Dept. of Justice, Washington, D.C., were on brief, for federal defendants-appellants.

E. Edward Bruce, Washington, D.C., with whom Mark D. Nozette, Covington & Burling, Washington, D.C., J. Berry St. John, Jr., Liskow & Lewis, New Orleans, La., G. Marshall Moriarty and Ropes & Gray, Boston, Mass., were on brief, for defendants-appellants Atlantic Richfield Co., et al.

Douglas I. Foy, Boston Mass., with whom Sarah M. Bates, Cambridge, Mass., and Sarah Chasis, New York City, were on brief, for plaintiffs-appellees Conservation Law Foundation of New England, Inc., et al.

Stephen M. Leonard, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Charles Corkin, II, Chief Asst. Atty. Gen., Jose R. Allen and Frank A. Gaynor, III, Asst. Attys. Gen., Environmental Protection Division, Boston, Mass., were on brief, for appellees Commonwealth of Massachusetts, et al.

Harrison A. Fitch and Peter D. Kinder, Boston, Mass., on brief for amicus curiae, New England Legal Foundation, New England Council for Economic Development, The Boston Chamber of Commerce, The New Bedford Chamber of Commerce, The Greater Providence Chamber of Commerce and Mayor John A. Markey, New Bedford, Mass., on behalf of the City of Bedford, Massachusetts.

Emilie Benoit, Legal Counsel, and Allen P. Rubine, Spec. Asst. Atty. Gen., Providence, R.I., on brief for amicus curiae, The State of Rhode Island, J. Joseph Garrahy, Governor.

\* Of the District of Massachusetts, sitting by designation.

LEVIN H. CAMPBELL, Circuit Judge.

The Commonwealth of Massachusetts and various conservation groups filed suit in the district court on January 19, 1978, seeking to enjoin the Secretary of the Interior from proceeding with the proposed sale of leaseholds in the Outer Continental Shelf off the coast of New England, styled OCS Sale No. 42. The Secretary had scheduled the opening of bids to take place on January 31. At the end of the day on Saturday, January 28, 1978, after three days of hearings, the district court issued a preliminary injunction forbidding the Secretary from taking further steps to consummate the sale. The sale was, as a result, cancelled,[1] and the Secretary and various oil companies that had been permitted to intervene appealed.

Subsequent to argument of the appeal in this court last spring and, indeed, at about the time that our decision in this case would have been anticipated, Congress adopted major amendments to the Outer Continental Shelf Lands Act, Pub.L.No. 95–372, 92 Stat. 629 (amending 43 U.S.C. § 1331 et seq.). These complex amendments provided for an oil spill fund and other safeguards whose absence figured largely in the district court's decision to enjoin the sale. They also added considerably to the law under which the leasing activity is to take place. We accordingly withheld any decision premised on the prior law, and invited supplemental briefing addressed to the effects of the amendments on this appeal.

In this opinion we now deal with the preliminary injunction in a legal and factual context that is altogether different from that which existed when the injunction was first issued.

1. After a hearing, a judge of this court denied the appellants' motion for a stay of the preliminary injunction on January 30, 1978. At that point the Secretary announced that he would postpone the sale pending resolution of this appeal. Stay was not sought in the Supreme Court.

## I. Background

This dispute concerns the first step toward the commencement of oil drilling in Georges Bank—a region described in the final environmental impact statement as "one of the most productive fishing grounds in the world." The offering of Georges Bank leaseholds is one of several similar transactions involving possible oil fields in the Outer Continental Shelf, each of which has produced its own history of litigation.[2] These sales received their impetus in 1974, when the President directed the Secretary of the Interior to increase the amount of acreage to be made available for oil and gas development as part of a national effort to reduce dependency on foreign energy sources. The Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, *et seq.*, enacted in 1953, had earlier spelled out this nation's jurisdiction over offshore seabeds. Extending "[t]he Constitution and laws and civil and political jurisdiction of the United States . . . to the subsoil and seabed of the Outer Continental Shelf," § 1333(a)(1), the Act authorized the Secretary to grant oil and gas leases in the outer shelf by competitive bidding. § 1337. In response to the President's 1974 directive, the Secretary called for positive and negative nominations of tracts in the North Atlantic region. After receiving extensive comments and consulting with various interested parties, including officials of the states affected, the Secretary in January 1976 designated 206 tracts in the Georges Bank area for potential leasing.

A draft environmental impact statement covering this sale was published by the Secretary in October 1976. In December 1976, the Secretary withdrew 28 of the tracts from the proposed sale pending resolution of a boundary dispute with Canada. Discussion of the sale of the remaining 178 tracts focused on the conflict between oil drilling and fishing and on concerns about the possible impact of oil contamination on the aquatic and onshore environment. The Environmental Protection Agency, in its written response to the draft environmental statement, concluded,

> "The integration of petroleum development with the highly productive fishing industry of Georges Bank represents a critical balancing of the nation's immediate energy needs and its long term usage of the renewable living resources of this area. In order to successfully pursue the simultaneous exploitation of both these resources, it is essential that a full appraisal of the environmental consequences of the proposed action be made. The DEIS on the proposed sale fails to accomplish this purpose; despite the wealth of information presented, there are a number of important areas with unsupported conclusions regarding the actual environmental impacts of oil and gas development (both primary and secondary) on the specific resources of Georges Bank, and on the onshore environment. Therefore we have rated this environmental statement as Category 3—Inadequate."

Specific concerns of the EPA were the lack of integration of the statement's discussion of environmental hazards, which obscured the analysis of particular risks, and the failure of the statement to follow through in its discussion of certain hazards, thereby not fully exposing the risks involved. The long-term consequences of the project, including pollution of estuaries used by support facilities and the increase of petroleum in the marine food supply over time, were not adequately addressed. In spite of these criticisms, however, the EPA did not find

---

2. OCS Sale No. 40, involving the Baltimore Canyon Trough, was conducted on August 17, 1976, after a district court preliminary injunction was stayed by the Second Circuit. *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978). Sale No. 39, involving the Gulf of Alaska took place on April 13, 1976, although the environmental impact statement for the sale has since been found inadequate. *Alaska v. Andrus*, 188 U.S. App.D.C. 202, 580 F.2d 465 (1978). The environmental impact statement issued in connection with the decision to accelerate the leasing program has been sustained by a district court. *California ex rel. Younger v. Morton*, 404 F.Supp. 26 (C.D.Cal.1975), *appeal pending*, No. 76–1431 (9th Cir.).

that the proposed sale was environmentally "unsatisfactory", a finding which would have triggered further review of the project by the Council on Environmental Quality. 42 U.S.C. § 1857h–7; *see Alaska v. Andrus*, 188 U.S.App.D.C. at 207–08, 580 F.2d at 470–71.

The Department of Commerce also had "serious reservations about the adequacy of the draft in some respects." Perhaps its most telling criticism concerned the statement's discussion of long-term effects on the marine population:

"The statement is devoid of support conclusions regarding the probable impact of gas and oil development on the environment and resources of Georges Bank and adjacent waters. No acknowledgement is readily apparent regarding our limited capability for assessing catastrophic, lethal, or sublethal effects of petroleum hydrocarbons (refined/unrefined) on the four million metric tons of fish biomass estimated to inhabit the area. No quantitative estimate is given of the magnitude of the fish populations that could be affected by petroleum hydrocarbon spills."

Other comments touched on inadequate biological data and, in one instance, inaccurate information depreciating the danger of small quantities of petroleum to fish spawning.

Representatives of all of the states immediately affected by the sale responded to the draft statement; a substantial share of the comments and criticisms were made by the Commonwealth of Massachusetts. The Commonwealth recommended that 26 of the proposed tracts be removed from the sale because of their proximity to the coast and consequent increased danger to the shore from oil spills. It also recommended various lease stipulations and operating orders governing development operations to decrease the environmental risks from operating the wells. Among the measures recommended were a requirement of unitization where the number of structures would thereby be reduced, the burial of pipelines whenever technologically feasible, and a

commitment to require another environmental impact statement before development of the fields, if marketable quantities of oil and gas were discovered. The Commonwealth also endorsed various measures suggested in the draft statement as possible steps to mitigate harmful consequences of drilling operations, including the establishment of a compensation fund for fishermen who suffer equipment loss as a result of offshore drilling activity. It criticized the draft statement for an inadequate discussion of the impact of oil spills on future fish supplies.

### A. The Final Environmental Impact Statement

After the distribution of the draft statement, the conduct of four days of public hearings in Boston and Providence, the receipt of over 300 written comments, and the response to the same, the Secretary released a final environmental impact statement on OCS Sale No. 42 on August 29, 1977. The final statement incorporated many modifications in response to the above comments; other changes were held to be infeasible in light of a conceded lack of detailed scientific knowledge about the long-term effects of oil pollution on the marine environment. The final statement describes extensively the nature of the proposed drilling operations and their possible impact on the region.

The tracts involved range from 63 to 167 miles east southeast of Nantucket Island, with all but one located more than 85 miles away from the nearest land. Each tract contains approximately 5700 acres; total acreage of the sale as currently contemplated would amount to roughly 730,000 acres, or 1,140 square miles. Water depths vary from 120 to 690 feet. The estimates of available energy resources run from .15 to .53 billion barrels of oil and 1 to 3.5 trillion cubic feet of natural gas. The projected field life is twenty years, with production beginning as soon as six years after the sale. However, no oil actually has been discovered in this area, and the estimates about available resources are just

that. One of the principal uncertainties in evaluating the environmental impact of this sale is the lack of knowledge about how much production actually will take place in these fields.

The adverse environmental impact, as the statement indicates, may be considerable. To begin with, drilling platforms unavoidably will reduce the area in which fishing can take place. If the field is successful, 113 square miles of present fishing ground could be displaced; the figure could run as high as 466 square miles if it becomes necessary to leave pipelines unburied. Mud from the drilling operations will be discharged back into the ocean, as will other wastes produced by the platforms. Onshore facilities will have to be built both to service the drilling operations and to handle the oil and gas that is mined from the tracts.

The overwhelming environmental concern, however, is the danger of oil spills. The area has been the site of substantial earthquakes, although the seismic risk of the field is not as great as parts of southern California and the Gulf of Alaska where offshore drilling has been approved. During the winter the region experiences extratropical cyclones (northeasters) which "are often intense and severe and are generally accompanied by strong, gusting winds and high seas." Hurricanes occasionally pass through the area during the summer and fall. The region exhibits some of the world's worst weather and sea conditions.[3] Nonetheless, the environmental statement indicates that properly designed drilling rigs and pipes would be capable of withstanding such conditions. Similar or even worse conditions exist in some other regions where drilling is now taking place or is authorized. Both the North Sea and the Gulf of Alaska are said to experience even greater sustained winds and wave height. Although confidence in these meteorological measurements is qualified by gaps in the data, it being hardest to obtain accurate measurements during the worst weather, the threat of a storm or large waves damaging a drilling platform or pipeline and causing a major oil spill appears to be no greater than that faced in the North Sea and is, like earthquake risk, slightly less than that endangering operations off Alaska.

The final environmental statement estimates the probabilities of oil spills during each phase of operations in Georges Bank, based in part on the experience with offshore drilling in the Gulf of Mexico. During the exploration phase there is estimated to be a very low probability of a large spill. However, even with full safety measures, at least one large oil spill attributable to human error is projected during the development and production phases. At least one large spill is also predicted during the transportation of the oil. The use of pipelines might lessen the risk of a spill during transportation, but tankers will be used unless an unexpectedly large amount of oil is found. Spills during transportation would be offset, however, to the extent the oil and gas obtained from the North Atlantic replace imports that also are shipped by sea, and pose similar risks.[4]

---

**3.** The maritime historian, Samuel Eliot Morison, wrote,

> "[A]nything might happen to you in the North Atlantic, even in summer, . . . [E]veryone but French fishermen avoided sailing in winter. Westerly gales hurled crested seas . . .; easterly gales drenched the sailors with chilling rain; fierce northerlies ripped their sails and cracked their masts."

The European Discovery of America: The Northern Voyages, A.D. 500–1600, at 3 (1971).

**4.** The following chart, contained in the proposed decision option document presented to the Secretary and based on data considered in the impact statement, gives some idea of the possible incidence of oil spills if operations get under way:

Estimated Changes in Expected Number of Oil Spills in U.S. Waters if DOI Proceeds with OCS Sale #42

| Spill Size (Range in bbls.) | Incremental Increase in Expected Number of OCS Oil Spills | | Incremental Decrease in Expected Number of Import Tanker Oil Spills |
|---|---|---|---|
| | Pipeline | Tanker Oil | |
| 0 — 2.4 | 919.48 | 699.45 | 62.99 |
| 2.4 — 23.8 | 65.62 | 56.48 | 21.21 |
| 23.8 — 238 | 11.81 | 8.00 | 5.47 |
| 238 — 2381 | 2.25 | 1.47 | .93 |
| 2381 — 23810 | .37 | .56 | .83 |
| over 23810 | .09 | .18 | .19 |
| Expected Total Amount Spilled (in bbls.) | 9,150 | 16,401 | 23,671 |

As important as the likelihood of a spill is its location. As the environmental statement states, "[t]he Northwest Atlantic area, and in particular Georges Bank, is one of the most productive fishing grounds in the world."[5] The region is so important that its depletion by foreign fishing fleets was a major factor leading Congress to enact the Fishery Conservation and Management Act, 16 U.S.C. §§ 1801 et seq., in order to put management of the fishery in American hands. See generally Maine v. Kreps, 563 F.2d 1043 (1st Cir. 1977). A primary aim of the Act is to rebuild the now diminished stocks of fish, allowing the domestic fishery to flourish. Estimates of the potential United States catch in this region for the period in which the wells would operate range from 500 to 750 million pounds.

The impact of an oil spill on this resource might be devastating. The oil would kill directly almost all planktonic fish eggs and larvae in its path, many benthic organisms residing on or near the ocean floor, and some portion of actively swimming fish, depending on the as yet undetermined ability of the last to avoid the contaminated area. Furthermore, among the species of fish whose spawning grounds are most exposed to the danger are those, such as haddock, already threatened by overfishing. A severe oil spill could destroy the New England haddock fishery by lowering the schools below the point of recruitment failure, or irreversible depletion. Even without this lethal long-term effect, which could remove from mankind's use for all time a resource of incalculable worth, the loss of even a particular year class of fish would cause substantial economic damage. The environmental statement estimated the value of an average year class of several important commercial species at the following values—haddock, $34.1 million; cod, $18.3 million; silver hake, $9.7 million; yellowtail flounder, $9.1 million; red hake, $3.0 million.

In addition, the indirect effect of oil pollution on the marine environment, although not fully understood, may give cause for alarm. Crude oil contains various heavy metals and hydrocarbons that are known carcinogens. Spilled oil can become mixed with sediments on the ocean floor, to be released slowly into the water over periods as long as a decade. As the environmental statement points out,

"Synergistic effects of oil, heavy metals, and other pollutants are not understood very well. The biota of the North Atlantic contain relatively high concentrations of polychlorinated biphenyls . . . . The high levels of PCB may lower the tolerance of the biota to petroleum hydrocarbons and trace metals. The synergistic interaction may result in severe, adverse impacts on the marine ecosystem, and is an area that needs more research."

One result might be sublethal but extensive contamination of commercial fisheries creating a substantial hazard to human health.

An oil spill also could come ashore, fouling beaches and killing nearshore wildlife. A large portion of the shoreline facing the tracts and the proposed routes for transporting the oil is used for recreation, and an oil spill in these areas could both harm the local tourist industry and destroy unique and beautiful scenery. An oil spill of the size that would be necessary to come ashore is unlikely during the exploration phase of drilling, but would be possible during production and development and even more likely during transportation operations.[6]

5. The plaintiffs originally asserted that the Georges Bank produced "as much as 15% of the world fish protein," and sought to contrast this with a "high find" on Georges Bank over a predicted 20 year life of the field of but 0.13% of annual world oil production and 0.099% of world gas production. Plaintiffs now appear to concede that 15% is too high a figure for Georges Bank fish, but nonetheless maintain, "Even utilizing intervenors' fishery figures, Georges Bank will produce a far larger percentage of world food fish than of world energy. Moreover, the fishery is perpetually renewable; the oil and gas would be withdrawn within 20 years."

6. The following chart gives the probability that an oil spill of an assumed size will affect particular resources, including onshore recreation areas. The tracts were divided into 11 production areas; all of the tracts in areas 1 through 4

The environmental statement considered various alternatives to the proposed sale, including exclusion of particular tracts, substitution of tracts on the continental slope, delay until additional environmental data or more effective safety measures were available, and withdrawal of the sale in favor of developing other energy sources. All of the other energy sources considered, however, either were not yet developed enough to be realistic alternatives or involved environmental and other costs that exceeded those of the contemplated sale. On balance, the environmental statement concluded, going forward with the sale as planned, with stringent safeguards, appeared to be the best alternative.

## B. *The Secretary's Decision*

After publication of the final statement, the staff of the Secretary of the Interior prepared a program decision option document, apparently a digest of the environmental statement along with a description of possible modifications in the sale. After reviewing this document, the Secretary on October 14, 1977, announced his tentative decision to proceed with the sale but deleted 12 of the 24 tracts nearest to shore from the sale. On November 7, the Governor of the Commonwealth wrote the Secretary expressing his general satisfaction with progress on the sale but noting three remaining areas of concern. First, the Governor strongly urged the removal of the remaining 12 tracts nearest to shore from the sale. Second, he requested a commitment that another environmental impact statement would be prepared before the development phase of operations began. Finally, he recommended that the final notice of sale include as part of its specifications a mandatory personnel training program to help oil company employees coordinate their activities with commercial fishing operations; a requirement that offshore oil transport and storage structures be minimized; and a requirement that all equipment carried from platforms to shore be marked to enable identification if lost overboard. The governors of Maine, New Hampshire, Rhode Island, Connecticut and New York also responded to the tentative notice of sale and generally expressed their approval of the project.

Subsequent contacts between the Department of the Interior and the Commonwealth revealed that other differences remained. Massachusetts, disappointed by setbacks in Congress for legislation that would have affected the Secretary's power

and all but one of five tracts in area 5 have since been withdrawn from the sale. Transportation route A would be to New Jersey, B to Portland, and C to Rhode Island or southern Massachusetts. The table does not reflect the likelihood of a spill occurring at any particular point, and in fact the risk would vary depending on the amount of oil found and other factors.

PERCENT PROBABILITIES THAT AN OIL SPILL OCCURRING AT POTENTIAL PRODUCTION AREAS AND LONG ANTICIPATED TRANSPORT ROUTES IN THE NORTH-ATLANTIC LEASE AREA WOULD IMPACT IMPORTANT BIOLOGICAL RESOURCES AND RECREATION AREAS.

| RESOURCES GROUP | PRODUCTION AREAS | | | | | | | | | | | TRANSPORTATION ROUTES | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | A | B | C |
| Beaches and recreation areas | 16 | 10 | 13 | 6 | 7 | 3 | 2 | 1 | 1 | 1 | 1 | 42 | 10 | 80 |
| Wildlife sanctuaries & wintering areas | 5 | 3 | 6 | 3 | 4 | ·1 | 1 | 1 | * | * | * | 9 | 4 | 33 |
| Coastal bird breeding areas | 3 | 2 | 2 | 1 | 3 | 1 | * | * | * | * | * | 7 | 9 | 7 |
| Pelagic bird nesting areas | * | * | * | * | * | * | * | * | * | * | * | * | 1 | * |
| Pelagic bird wintering area | 17 | 10 | 17 | 12 | 10 | 5 | 3 | 2 | 2 | 1 | 2 | 21 | 10 | 51 |
| Eagle and osprey nesting sites | 3 | 2 | 2 | 1 | 1 | 1 | * | * | * | * | * | 14 | 1 | 14 |
| Cod and haddock spawning areas | 25 | 20 | 31 | 35 | 40 | 25 | 27 | 16 | 20 | 12 | 26 | 10 | 37 | 13 |
| Silver and red hake spawning areas | 24 | 33 | 17 | 24 | 12 | 24 | 25 | 43 | 36 | 46 | 22 | 9 | 4 | 3 |
| Sea herring spawning areas | 8 | 6 | 16 | 8 | 12 | 5 | 4 | * | 2 | 1 | 2 | 3 | 12 | 3 |
| Atlantic salmon migration routes | * | * | * | * | * | * | * | * | * | * | * | * | * | * |
| Shortnose sturgeon areas | * | * | * | * | * | * | * | * | * | * | * | * | * | * |
| Shellfish areas | 6 | 3 | 4 | 2 | 3 | 1 | 1 | 1 | 1 | * | * | 20 | 5 | 40 |
| Harbor seal whelping areas | * | * | * | * | * | * | * | * | * | * | * | * | 1 | * |
| Grey seal whelping areas | 1 | 1 | * | * | * | * | * | * | * | * | * | 2 | * | 7 |
| Salt marshes | 2 | 1 | 1 | * | 1 | * | * | * | * | * | * | 10 | 2 | 3 |
| Eel grass beds | * | * | * | * | * | * | * | * | * | * | * | * | * | * |
| Kelp beds | * | * | * | * | * | * | * | * | * | * | * | * | * | * |
| OVERALL PROBABILITY ASHORE | 23 | 17 | 23 | 14 | 21 | 8 | 6 | 4 | 4 | 3 | 4 | 44 | 40 | 79 |
| **RANK ORDERING (Oil Spill Impact Risk) | 110 | 91 | 109 | 91 | 93 | 66 | 63 | 64 | 62 | 61 | 53 | | | |

*Less than 0.5 percent probability
**Obtained by combining percent probabilities in each resource category (assuming equal weight or value for each resource). The higher the total, the greater the risk anticipated.

to regulate offshore drilling operations,[7] proposed that the Secretary implement some of the measures administratively. The Commonwealth specifically sought to have the Secretary create by regulation two funds, one to compensate fishermen who suffer economic loss because of drilling operations and the other to pay for damage caused by oil spills. The latter fund was seen also as a deterrent measure, with liability for compensation payments tied to responsibility for spills. The impact statement had referred to these funds as a means of enhancing the Secretary's power to mitigate the adverse environmental consequences of the sale, but it assumed both that the Secretary would have to await legislation before he could implement the funds and that in any event the legislation would apply to leases already sold.

The Environmental Protection Agency also registered its dissatisfaction with the proposed sale. After reviewing the final environmental impact statement, the EPA complained that the Department of the Interior had failed to develop the kind of integrated oil spill model careful analysis demanded, and that Interior's responses to EPA's earlier criticisms of the draft statement were in some cases superficial. The agency recommended that Interior delay the sale until either Congress enacted the legislation that would permit greater precautions or further environmental studies provided more data about risk to the environment. Interior responded to EPA's criticisms on December 2, 1977, pointing out that a regulation recently adopted by the Secretary provided for the suspension of drilling operations upon discovery of unforeseen environmental risks, thereby obviating need for the lease cancellation procedure contained in the proposed legislation which EPA regarded as critical. The re-

sponse also argued that the more sophisticated risk model advocated by EPA could not be applied to the Georges Bank sale at this time because of a lack of data about the effects of spilled petroleum on the marine environment.

The final notice of sale was published on December 30, 1977, announcing that the Secretary would open bids on January 31, 1978. Many but not all of the Commonwealth's concerns were met in the final notice. Massachusetts had asked that the 12 tracts nearest to shore be deleted from the sale, and Maine had joined the request as to one of the 12 which was especially close to a major fishing ground. The Secretary's staff had contended that the tracts in question did not pose as substantial a hazard to fishing as the 12 tracts that had been deleted earlier from the sale, but conceded that the one tract that Maine had focused on was immediately adjacent to an area identified as important for fishing and, given the inaccuracy of available data, might also overlap with substantial fishing operations. The Secretary instead ordered the deletion of the 11 tracts that presented a lesser hazard but retained the one tract singled out by Maine. The Secretary also adopted a regulation requiring preparation of another environmental impact statement before production of any consequence could begin and stipulated that oil company personnel must receive environmental training. He also added lease stipulations to reduce the number of offshore support structures and to require marking of equipment that might be lost overboard. The Secretary continued to maintain that he lacked legal authority to implement an oil spill liability fund or a fishermen's gear compensation fund and therefore took no action on these proposals. He recognized the importance of these funds and on several occasions during

---

7. A bill to amend the Outer Continental Shelf Lands Act to give the Secretary more definite authority with respect to management of these leases passed both houses of Congress in 1976, but the legislation died after a conference committee failed to work out differences between the House and Senate versions. In the next session the Senate passed S.9, containing similar provisions, and the House was considering

this bill as the Secretary deliberated on whether to proceed with this sale. On February 2, 1978, after the district court had issued the preliminary injunction and the Secretary had postponed the sale, the House passed its version of the Senate bill. 124 Cong. Rec. H602–22 (Feb. 2, 1978). The legislation was finally enacted and signed by the President in September of 1978.

this period expressed a strong desire for Congress to pass the authorizing legislation, but he also continued to believe that the legislation, when enacted, could be applied to leases already entered into by the government.[8]

### C. The Case

#### 1. The District Court's Decision

Less than two weeks before the sale was to take place, Massachusetts and other plaintiffs filed this suit.[9] They argued that the Secretary's decision to go ahead with the sale in spite of his apparent lack of authority to implement what he conceded to be desirable environmental safeguards violated a legal duty established by the Outer Continental Shelf Lands Act to protect the Georges Bank fishery, and was arbitrary and capricious. The complaints also charged that the sale would illegally interfere with implementation of the Fishery Conservation and Management Act and the Massachusetts Coastal Zone Management Plan, and violated the National Environmental Policy Act, the Marine Sanctuaries Act, and the Endangered Species Act.

After three days of hearings and the submission of documentary evidence, the district court, acting under considerable time pressure, issued a preliminary injunction forbidding the Secretary from proceeding with the sale. In an opinion delivered orally from the bench, the district court ruled that plaintiffs would likely prevail on the merits, because the Secretary of the Interior had committed several statutory violations. The court found that the Secretary had violated the Outer Continental Shelf Lands Act by not meeting "the affirmative duty of taking all steps reasonably possible" to preserve the fishery resources of Georges

Bank. The court noted that the Fishery Conservation and Management Act, 16 U.S.C. §§ 1801 et seq. and the Coastal Zone Management Act, 16 U.S.C. §§ 1451 et seq., although not directly applicable, further underscored the "duty of the Secretary to be especially concerned and to be the guardian in a sense of fishing in the Outer Continental Shelf waters  . . . ." The court found a violation of this duty in the Secretary's permitting of sales to take place before enactment of the legislation that would authorize several important safeguards designed to protect fishing. These safeguards were an oil spill liability fund, a fishermen's gear compensation fund, and a procedure for compensating lessees whose drilling operations are suspended because of unforeseen environmental hazards.[10] The court felt that the Secretary did not then have the authority to create these safeguards by administrative action, and that prior passage of the pending legislation was essential if the Secretary was to protect the fisheries. The court ruled further that the Secretary's decision to proceed with the sale before passage of the pending legislation was "arbitrary and capricious," and therefore subject to judicial reversal under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

The court also found that the environmental impact statement and other studies relied upon by the Secretary, including the proposed decision option document, did not satisfy the standards of the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq. A principal deficiency of the impact statement, the court found, lay in its failure to discuss the environmental benefits to be gained by delaying the sale until Congress passed the above-mentioned legislation. In

---

**8.** After the final notice of sale, the Secretary removed 27 more tracts from the sale because of a boundary dispute with Canada.

**9.** Jurisdiction was asserted under several statutes: 28 U.S.C. § 1331; 43 U.S.C. § 1333(b) (Outer Continental Shelf Lands Act); 16 U.S.C. § 1861(d) (Fishery Conservation and Management Act); 42 U.S.C. § 4321 (National Environmental Policy Act); 5 U.S.C. §§ 701–06 (APA); 28 U.S.C. § 1361 (Mandamus). The Secretary

does not dispute the jurisdiction of the district court.

**10.** As already noted, the Outer Continental Shelf Lands Act Amendments, Pub.L.No. 95–372, 92 Stat. 926, enacted in the summer of 1978 after the district court had ruled, and after this appeal was argued, includes the three provisions the absence of which had so troubled the district court.

addition, the court regarded as deficiencies the absence of any reference to the possible use of the area as a marine sanctuary, and insufficient specific reference to the damage to beaches on Martha's Vineyard and Cape Cod that a major oil spill might cause. As a final deficiency the court noted the inadequacy of Interior's response to EPA's criticisms of the final environmental statement.

Having thus found it likely that plaintiffs would prevail on the merits of their claims, the court undertook to assess the relative harm to the different parties stemming from the grant of a preliminary injunction. The court felt that going ahead with the sale before Congress acted might forever foreclose application of the lease condemnation procedure and the compensation and liability funds to these leases. While delay would be costly to the oil companies, these increased costs could be reflected in the form of lower bids:

"We are not talking here, and I think this is important to emphasize, about prohibiting leasing of oil and gas tracts in the Georges Bank area. None of the plaintiffs has contended that such exploration and exploitation be banned outright. The plaintiffs are looking for a delay of a relatively few months to preserve a resource that has taken millions of years to accrue, and which will be with us for better or worse for untold centuries to come."

Believing the irreparable harm involved in immediate action to outweigh the costs of delay, the court granted the injunction and forbade the Secretary from taking further steps on the sale.

2. *Contentions of the Parties on Appeal*

As we have pointed out, *see* note 10, *supra,* this appeal from the granting of a preliminary injunction was argued and briefed prior to the enactment of the 1978 amendments to the Outer Continental Shelf Lands Act. In their original arguments before us, the Government and the oil company intervenors [11] conceded that the Secretary had some authority, and perhaps even some duty, to take steps to protect the fisheries. But they minimized the extent of his obligations in this regard, and they strenuously denied that the district court had any right to hold up the sale of leases in Georges Bank until Congress beefed up the Secretary's powers to protect the fisheries. In their view, Congress intended the Secretary to act with whatever protective authority he had at the time, whether or not adequate. They felt the district court overemphasized the Secretary's legal responsibility to safeguard fishing and fishery interests. They also took issue with the district court's criticism of the environmental impact statement. The court, they felt, was relying too much upon its own appraisal of the merits or demerits of the leasing decision, rather than deferring to the Secretary's views, which should be reviewed under a restricted "rule of reason" standard.

The Commonwealth and the conservationist plaintiffs responded that the Secretary had violated fiduciary and statutory duties by proceeding with the Georges Bank sale. To have permitted leasing as planned was in their view premature and unwarranted. The Commonwealth did not oppose drilling operations in Georges Bank in principle, but argued that the lease sale must "be preceded by regulatory safeguards sufficient to protect the Massachusetts fishing and tourist industries, and adequate to fulfill the responsibilities imposed upon the Secretary . . . ." In particular the Commonwealth contended that the safeguards contained in the pending amendments to the Outer Continental Shelf Lands Act were essential to ensure the degree of protection of the marine environment which

---

11. In addition, the State of Rhode Island and the New England Legal Foundation, joined by the New England Council for Economic Development, the Boston Chamber of Commerce, the New Bedford Chamber of Commerce, and the Greater Providence Chamber of Commerce, have submitted briefs as *amici curiae* supporting generally the position of the Secretary and the oil company intervenors and arguing in particular that the district court improperly disregarded regional energy needs and national energy policy.

882

the Secretary of the Interior was charged with ensuring. The conservationist plaintiffs agreed with Massachusetts that drilling operations should not commence without further safeguards; and, going even further, they listed additional measures believed to be necessary. They also urged this court to uphold the district court's preliminary finding that the environmental impact statement was inadequate.

On September 18, 1978, the President signed the 1978 Outer Continental Shelf Lands Act Amendments embodying provisions for an oil spill fund, for fishermen's gear compensation, and for suspension of drilling, absence of which from the earlier law was cited by the district court as a major reason for its injunction. At our request, supplemental briefs were filed addressing the amendments' impact on this appeal. In these, defendants have continued to oppose the injunction, and plaintiffs have continued to support it. The Government argues that the amendments divest the preliminary injunction of its "nuclei." The Government says that it will take "about seven months" after the injunction is lifted before a sale of leases can take place. Any need for equitable relief is thus far less apparent than in the period immediately before the scheduled sale, when the district court first acted. The intervenor oil companies endorse the Government's stand against the injunction, and insist as well that the 1978 amendments are at odds with the district court's belief that a sale would violate NEPA and the APA.

While the Government continues to stress the need for expedition in oil and gas development, and to deny any overriding duty to protect the fisheries, it concedes that the amendments require it to conduct the leasing program in such a way as to protect other resources, including the fisheries. The key word in the Secretary's reading of the amendments appears to be "balance"— balances must be struck, he says, between oil and gas development and protection of the other uses of the outer continental shelf and coastal environment. The Secretary says that he is at work promulgating the regulations the amendments require, and that there is no need for an injunction.

Massachusetts, on the other hand, urges that we uphold and continue the injunction. It argues that the amendments do not "moot" the case, because not being self-executing, they do not satisfy the Secretary's obligation to protect fisheries, and because they do not overcome the alleged inadequacies of the environmental impact statement. Both Massachusetts and the conservationist plaintiffs would like this court to rule on the issues that survive passage of the amendments—such as the adequacy of the environmental statement. They also believe that we should promulgate directions to the Secretary on how to interpret and carry out his duty under the amendments, maintaining the injunction in the meantime.

II. *Appellate Review of the District Court's Opinion*

We must emphasize the limited focus of this appeal. The appeal is from a preliminary injunction issued on the eve of a proposed sale of leases. This is not an appeal from a final judgment after a full hearing on the merits, nor can it take full account of the recent legislative revisions and the Secretary's actions thereunder. Prior to passage of the recent amendments to the Outer Continental Shelf Lands Act, the question would simply have been whether the district court abused its discretion in concluding that plaintiffs enjoyed a probability of success on the merits and that irreparable harm would occur without an injunction. Since passage of the amendments there has arisen the further question whether the original grounds for the injunction have not, in large measure, been mooted.

A. *Mootness of the Question of Secretary's Duty to Await Legislation*

The reason for granting preliminary relief which the district court stressed above others was that it would be a breach of the Secretary of the Interior's duty to safeguard the fisheries to proceed with the sale

without awaiting enactment of the protections embodied in legislation then pending. This reason was premised on certain suppositions, see infra, concerning the degree of responsibility imposed by the then-existing Outer Continental Shelf Lands Act upon the Secretary to safeguard fishery resources. Holding that the Secretary's legal duty of care was a high one, the district court pointed to statements of the Secretary himself regarding a need for the pending legislation, and concluded that the Secretary could not conscientiously proceed with the sale without awaiting congressional action on this vital legislation.

Whatever the legal merits of the district court's position—and much of the pre-amendments argument in this case was addressed to that issue—it is obvious that the issue is now moot. The legislation has in fact been enacted, and we now review the district court's injunction under the law as it presently is, not as it once was. *Bradley v. School Board*, 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). To the extent the intended object of the injunction was to hold up the sale until Congress could enact legislation of this nature, that object has been achieved, and is no longer capable of furnishing support for injunctive relief.

### B. *The Other Grounds for the Injunction*

Since the need to await legislative safeguards is no longer a reason capable of supporting the injunction, it can now be sustained only if other grounds cited by the district court warrant continued equitable relief. These relate to possible deficiencies in the environmental impact statement, and we shall turn next to them.

Section 102(2) of the National Environmental Policy Act, 42 U.S.C. § 4332(2), requires all agencies of the federal government proposing "major Federal actions" to prepare "a detailed statement by the responsible official" concerning, *inter alia*, the environmental impact of the proposed action and any alternatives to the action, including the environmental consequences of the alternatives. *NRDC v. Morton*, 148 U.S.App.D.C. 5, 11–12, 458 F.2d 827, 833–34 (1972). This circuit has explained the purposes behind this requirement:

"The 'detailed statement' required by § 4332(2)(C) serves at least three purposes. First, it permits the court to ascertain whether the agency has made a good faith effort to take into account the values NEPA seeks to safeguard. To that end it must 'explicate fully its course of inquiry, its analysis and its reasoning.' *Ely v. Velde*, 451 F.2d 1130, 1139 (4th Cir. 1971); *Appalachian Power Co. [v. EPA*, 477 F.2d 495, 507 (4th Cir. 1973)]. *See also Natural Resources Defense Council v. E. P. A.*, 478 F.2d 873 [875] (1st Cir. 1973); *Environmental Defense Fund v. Ruckelshaus*, 142 U.S.App.D.C. 74, 439 F.2d 584 (1971). Second, it serves as an environmental full disclosure law, providing information which Congress thought the public should have concerning the particular environmental costs involved in a project. To that end, it 'must be written in language that is understandable to nontechnical minds and yet contain enough scientific reasoning to alert specialists to particular problems within the field of their expertise.' *Environmental Defense Fund v. Corps of Engineers*, 348 F.Supp. 916, 933 (W.D.Miss.1972). It cannot be composed of statements 'too vague, too general and too conclusory.' *Environmental Defense Fund v. Froehlke*, 473 F.2d 346, 348 (8th Cir. 1972). Finally, and perhaps most substantively, the requirement of a detailed statement helps insure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug. A conclusory statement 'unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind' not only fails to crystallize issues, *Natural Resources Defense Council v. Grant*, 355 F.Supp. 280, 287 (E.D.N.C. 1973), but 'affords no basis for a comparison of the problems involved with the proposed project and the difficulties involved in the alternatives.' *Monroe County Conservation Council v. Volpe*,

472 F.2d 693, 697 (2d Cir. 1972). Moreover, where comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. There must be good faith, reasoned analysis in response." *Silva v. Lynn,* 482 F.2d 1282, 1284–85 (1973). In ensuring compliance with these standards, however, a court is governed by a "rule of reason" and may not use minor lapses in the statement as an excuse to thwart actions that it believes to be unwise, *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 553–55, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), or require of the discussion a degree of detail too exacting to be realized. *County of Suffolk v. Secretary of Interior,* 562 F.2d at 1377–78; *Sierra Club v. Morton,* 510 F.2d 813, 820 (5th Cir. 1975). Courts cannot require the agency to consider alternatives to the action that are too hypothetical or infeasible to merit serious consideration. *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. at 551, 98 S.Ct. 1197; *Cummington Preservation Committee v. FAA,* 524 F.2d 241, 244 (1st Cir. 1975); *NRDC v. Morton,* 148 U.S.App. D.C. at 12, 458 F.2d at 834.

The district court found that the environmental impact statement and other documents associated with the decision to go forward with the sale were deficient in four respects, each of which will be discussed in turn.

### 1. *Pending Legislation*

The district court deemed inadequate the environmental statement's cost-benefit analysis of the alternative of delaying the sale until Congress enacted legislation to define more clearly the Secretary's authority to implement the various conservation measures which have since been included in the amendments. This criticism of the environmental statement is obviously no longer pertinent, the legislation having passed. It furnishes no basis for continued injunctive relief.

### 2. *Martha's Vineyard and Cape Cod*

Another flaw in the environmental statement found by the district court was its failure to calculate cost estimates for the fouling of beaches on Martha's Vineyard and Cape Code as the result of a major oil spill. The court recognized that the environmental statement calculated the probability of these particular events occurring and generally recognized the recreational and aesthetic importance of these areas, and noted that the statement did include a quantitative estimate for damage to Long Island beaches, but held that the absence of a like calculation for Martha's Vineyard and Cape Code constituted a fatal gap in the statement's weighing of the risks of the sale.

Although a more detailed analysis of the risks of the sale to these areas would have seemed desirable in view of their special recreational value and beauty, that an otherwise satisfactory analysis of the oil spill threat to onshore recreational activities did not single them out cannot be regarded as a violation of NEPA. The entire New England shoreline, much of which is beautiful and significant recreationally in an economic sense, would be exposed to some risk as a result of this sale. It would hardly be feasible to estimate the separate economic importance of each mile of shoreline in order to calculate with even greater precision the risks presented. The calculation of Long Island served as a model for suggesting what kind of damage could be expected by each of these recreationally significant areas, and no reason has been advanced to suggest that as a model it is inadequate. This is so, at least, under the Outer Continental Shelf Lands Act as it existed when the district court acted, and nothing has been called to our attention in the amendments that would change our analysis.

### 3. *Use as a Marine Sanctuary*

Under the Marine Sanctuaries Act, 16 U.S.C. §§ 1431–34, the Secretary of Commerce can designate portions of the Outer Continental Shelf as marine sanctuaries,

which would give the Secretary authority to issue and enforce "necessary and reasonable regulations to control any activities permitted within the designated marine sanctuary . . . ." 16 U.S.C. § 1432(f). The Secretary of Commerce could exercise this power to exclude all drilling operations and otherwise take steps to conserve and protect the natural resources of the region; alternatively, he could permit drilling operations to the same extent as the Secretary of the Interior acting under the Outer Continental Shelf Lands Act. The district court ruled that the absence of any reference to designation of Georges Bank as a marine sanctuary in the environmental impact statement constituted a breach of the Secretary's duty to discuss reasonable alternatives to the sale. The district court believed that this failure led the Secretary to disregard the positive benefits that could be achieved by cultivating the fishing industry in Georges Bank through the Sanctuaries Act.

In some respects this claim is similar to one raised and rejected in *Sierra Club v. Morton, supra.* There it was argued that the failure of an impact statement for an off-shore oil lease sale to discuss the alternative of exploratory drilling conducted by the federal government rather than by private companies constituted a violation of the Secretary's duties under NEPA. The Fifth Circuit ruled that federal exploration would present substantially the same environmental hazards as private operations, and "[a]n alternative which would result in similar or greater harm need not be discussed." 510 F.2d at 825. Here the environmental statement both considered in detail the alternative of not going ahead with the sale at all and recognized the likelihood that the Georges Bank fishing industry would increase in importance as a result of the Secretary of Commerce's authority under the Fishery Conservation and Management Act. The Secretary of Commerce already has substantial power under the Fishery Act to conserve and protect the Georges Bank fishing grounds from both foreign and domestic depredation, *see Maine v. Kreps, supra,* and the Secretary of the Interior has broad regulatory authority to promote conservation under the Outer Continental Shelf Lands Act, as amended in 1978, including the power not to authorize oil and gas leases that will constitute an unreasonable risk to the fishery resources, *infra.*

But while under the Marine Sanctuaries Act the land-use options of the Secretary of Commerce are much the same as those of the Secretary of the Interior under the Outer Continental Shelf Lands Act, the management objectives are different. It is thus possible that different environmental hazards would result depending on which program was invoked. Under the latter Act, the emphasis is upon exploitation of oil, gas and other minerals, with, to be sure, all necessary protective controls. Under the Sanctuaries Act, the prime management objectives are conservation, recreation, or ecological or esthetic values. 16 U.S.C. § 1432. Drilling and mining may be allowed, but the primary emphasis remains upon the other objects. The marked differences in priorities could lead to different administrative decisions as to whether particular parcels are suitable for oil and gas operations. And should there be particular areas of Georges Bank that are uniquely important to the fishery, for example, a key breeding area or the like, management by the Secretary of Commerce, the administrator of the Fishery Act, rather than by the Secretary of the Interior might be advantageous. At least the question seems worth exploring.

These considerations strongly suggest that the environmental impact statement should discuss the possible applicability of the Marine Sanctuaries Act. Such a discussion would focus additional attention upon the question of whether or not there are any portions of Georges Bank so uniquely valuable that they should be singled out for this special protective status. We cannot, however, be sure what impact the 1978 amendments may have upon this analysis. The amendments are extremely complex, and we hesitate at this juncture to foreclose argument on whether passage of the amendments reflects a congressional purpose to rule out applicability of the Marine

Sanctuaries Act and similar provisions. There is the further question, also, as to whether plaintiffs' failure to seek a study of the possible application of the Marine Sanctuaries Act at some earlier date precludes the matter now. *Vermont Yankee Nuclear Power Corp.*, 435 U.S. at 553–54, 98 S.Ct. 1197. These issues were not before the district court at the hearing on the preliminary injunction nor were they argued initially before us. As an appellate court, we prefer not to rule on issues of this complexity without a lower court decision and without a more adequate presentation before us. There is time for them to be heard as the case continues in the district court. We therefore leave it open, for future ruling by the district court, whether the amendments provide any reason to modify what is our tentative decision, that the environmental impact statement should be extended to include a discussion of the marine sanctuary alternative. The court should also consider the issue in light of the Supreme Court's *Vermont Yankee* opinion.

Whatever the outcome, we do not see the lack of prior treatment of this subject in the environmental statement as a reason for maintaining the present injunction. The emergency that prompted the injunction—the threatened February 1978 sale of leases—has passed. There is presently ample time for inclusion of such a discussion in the environmental statement, if required, and for the Secretary to take account of it, prior to a leasing decision. We are confident that the Secretary will include such a statement either on his own initiative, if he so determines, or upon order of the district court if the matter remains disputed and if the district court rules against the Secretary. Injunctive relief is now premature. *See Rhode Island Minority Caucus, Inc. v. Baronian,* 590 F.2d 372, 374 (1st Cir. 1979).

### 4. *Response to EPA Comments*

The Environmental Protection Agency, in its comments on the final impact statement, criticized the oil spill risk model employed as not sufficiently elaborate to give a satisfactory picture of the environmental costs of the sale. The Department of the Interior responded that although a more sophisticated model would be desirable, not enough scientific data was available to make the kind of model envisioned by EPA worthwhile. Even though EPA did not itself believe this flaw was sufficiently important to require delay of the sale for further study, the district court found that the criticism was telling and Interior's response inadequate. The court adopted the EPA comments as indicating another NEPA violation.

EPA generally had regarded Interior's actions concerning offshore oil leasing to be precipitate, and in some objective sense it may be correct. *See Alaska v. Andrus,* 188 U.S.App.D.C. 202, 580 F.2d 465; *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368. We can only hope that the Department of the Interior is not moving faster than technology safely allows. The law is clear, however, that NEPA requires only that an agency respond adequately to EPA criticisms of a proposed action; the EPA view is not to be treated as controlling. *Id.* Here, Interior made a reasonable response, not contradicted by the record or otherwise shown to be in bad faith, to a criticism that EPA itself did not regard as so important as by itself to require delay. Greater use of modern analytical techniques for calculating the possible consequences by agencies contemplating environmentally significant activities may be desirable, *see generally,* Maechling, *Systems Analysis and the Law,* 62 Va.L.Rev. 721 (1976), but within wide limits, the final decision as to how much analysis is necessary in view of the available data must be the agency's, subject to judicial review only for obviously incorrect results or methodology. Flaws of such magnitude have not been shown.

Ours is, of course, only a preliminary ruling based on the factual situation that existed when the district court ruled on the issuance of a preliminary injunction. Depending on the need for a supplemental environmental statement and on possible relevant requirements of the 1978 amendments—matters on which we do not pass, as they are not necessary to this decision—as

well as on the availability of new studies and data, the question of what is or is not an acceptable environmental statement could take on new dimensions, although plaintiffs' burden to show error would at all times remain, see discussion *infra*. We do not mean to foreclose the district court from further inquiry which it believes to be justified by new circumstances.

In any event, however, for the same reasons stated regarding the marine sanctuary issue, we see no basis for continuing the present preliminary injunction.

### 5. *Conclusion Against Continuing Injunction*

We conclude, therefore, that none of the criticisms of the environmental statement contained in the district court's injunctive ruling warrant continuing the preliminary injunction, although at least one of them—relating to the marine sanctuary designation—warrants further consideration. To the extent the environmental statement should go into the marine sanctuary alternative, this matter can be pursued in the time remaining before a fresh sale is attempted—an injunction is not currently needed to ward off any threatened irreparable harm. Should the government fail in this or other respects to do its duty, there will be time to obtain appropriate relief in the district court after further proceedings. With the threat of an imminent sale of leases over, the court can proceed expeditiously to the merits, following any amendment of pleadings needed to take account of the 1978 amendments and present realities.

### C. *Propriety of our Consideration of Matters Arising after Enactment of 1978 Amendments*

The plaintiffs urge that the injunction be continued in order to prevent the Secretary from pushing ahead with the lease sale in a manner and for reasons that they fear would be improper. They point out that implementation of the 1978 Outer Continental Shelf Lands Act Amendments calls for the Secretary to promulgate regulations, that the effectiveness of the authorized pro-

tective measures depends on the quality of the regulations, that it may be that the Secretary will not fulfill his duty, and that it is, in effect, too early for anyone, including the fish, to relax. All of this may be true, but it affords no reason for continued injunctive relief at this point. The conservationist plaintiffs go too far when they urge that we instruct the district court to continue the injunction "until such time as the Secretary has complied with OCSLA, as amended, and NEPA and demonstrated unequivocally his good faith in proceeding with the Georges Bank leasing program." Citing to cases where federal courts have sought to overcome racial discrimination in local schools, or to force municipal officials to remedy unconstitutional conditions in jails, these plaintiffs urge us to place the Secretary of the Interior in virtual receivership to make certain that he does not subordinate the interests of the fisheries to the interests of those seeking to tap underseas oil and gas deposits.

There is no legal or constitutional precedent for our doing so. Federal courts are courts of limited jurisdiction, and, except for a possible range of exceptions not involved here, may exercise only the authority granted to them by Congress. *Chase Manhattan Bank v. South Acres Development Co.,* 434 U.S. 236, 239–40, 98 S.Ct. 544, 54 L.Ed.2d 501 (1978); *Moor v. County of Alameda,* 411 U.S. 693, 715, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); *Sheldon v. Sill,* 49 U.S. (8 How.) 441, 12 L.Ed. 1147 (1850); *Morgan v. Kerrigan,* 530 F.2d 401, 422 (1st Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976). *Compare* Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic,* 66 Harv.L.Rev. 1362 (1953), *with* Wechsler, *The Courts and the Constitution,* 65 Colum.L.Rev. 1001 (1965). Congress has certainly given us no general authority to place prior restraints upon the Department of the Interior in order to force its decision-making into a particular mold. *Compare Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. at 544–45, 98 S.Ct. 1197. Our usual authority is limited to reviewing.

the Secretary's actions as they emerge—as provided in 5 U.S.C. § 706, which, when there is no claim of constitutional or procedural violation, permits a court to set aside the decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." So long as the Secretary's determinations are within the law, are based upon consideration of the relevant factors, and do not involve clear errors of judgment, a court may not substitute its view. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1970); *NLRB v. United Insurance Co.*, 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968); *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). *See generally*, 4 K. Davis, Administrative Law Treatise § 30.05 (1958 & 1970 Supp.).

Furthermore, the scope of the present appeal is restricted to the preliminary injunction from which the appeal was taken. We may not now reach out for a host of new grounds that were not before the district court. Novel issues must first be raised in the district court. It would not, moreover, be wise for us to issue advance directions to that court, before argument and before the controversy provoking them has been framed. The 1978 amendments constitute a substantial revision of the Outer Continental Shelf Lands Act. We should not cursorily construe legislation of such complexity and importance.

In addition, it is neither our role nor the role of the district court to issue advance directions or advice to the Secretary of the Interior as to how he is to exercise the discretion reposed in him by the Congress. The courts can later countermand the Secretary's orders and actions if they are arbitrary, capricious or illegal, but the initiative rests with him.

The Secretary has not acted so outrageously that we would be justified in summonsing the kind of power that courts occasionally exercise to control those who flout

their process. The Secretary has steadfastly maintained that he intends to safeguard the environment, and he has taken a number of important actions towards this end. He has shown no disrespect towards the court. While there may continue to be important differences necessitating further court proceedings, the Secretary cannot be likened to a municipality bent on violating the civil rights of citizens.

If it appears the Secretary is not complying with the Outer Continental Shelf Lands Act as amended, that will be a matter for further action in the district court. Questions such as whether the amendments require a supplemental environmental impact statement and similar matters of this ilk cannot be settled in this appeal; their existence affords no basis for continuing an injunction issued for other reasons and in other circumstances.

### D. *Comments on the Secretary's Duty to Protect Fishing*

While for reasons stated we decline to decide some of the questions that have been argued in the briefs and supplemental briefs, there are certain remaining issues, argued and briefed before us and of importance to the future conduct of the case, on which we can appropriately comment.

■ In their discussion of the Secretary's legal duty to protect fisheries, the parties have referred to former § 3(b) of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1332(b), now § 1332(2), which reads,

"this subchapter shall be construed in such a manner that the character of the waters above the Outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected."

Plaintiffs have argued that this imposes a duty on the Secretary to see that mining and drilling are conducted absolutely without harm to fisheries. However, it is clear that the clause was inserted with no such purpose in mind and we question its materiality to the issue at hand. The reference to "fishing" was inserted in the bill that eventually became the Outer Continental Shelf

Lands Act to show that the United States' extension of its jurisdiction into the Outer Continental Shelf was limited to the subsoil and seabed. The Nation was not, by the Act, asserting control over the waters of the region. This message was believed necessary lest the Act give foreign nations an excuse for interfering with navigation and fishing in the high seas off their own coasts. See S.Rep.No. 411, 83d Cong., 1st Sess. 7 (1953); Hearing on S. 1901, 83d Cong., 1st Sess. 385, 393–94 (1953). The Convention on the Continental Shelf, signed in 1958, confirmed this Nation's continued willingness to observe the traditional three-mile limit notwithstanding its assertion of jurisdiction over mineral wealth farther offshore. 15 U.S.T. 471. Not until enactment of the Fishery Conservation and Management Act in 1976, 16 U.S.C. §§ 1801 *et seq.* did the United States undertake to regulate not only the seabed and subsoil of the Outer Continental Shelf but the fish and fishing activities in the waters above. This later, unrelated legislation reflected a federal policy for the conservation of fishery resources, but we are unable to see that it altered the meaning and purpose of § 3(b), which had been directed at the legal right to fish rather than at prohibiting physical impediments.

We leave open, for consideration with the merits, the significance, if any, of Congress's reenactment of § 3(b) in the 1978 amendments. Quite likely, the more explicit language in the amendments, indicating the Secretary's obligation to take affirmative measures to conserve the fishery and other resources, will reduce the importance of the section as a possible argument for the plaintiffs.

While § 3(b) seems to us of questionable significance here, we believe that both past and present versions of the Outer Continental Shelf Lands Act place the Secretary under a duty to see that gas and oil exploration and drilling is conducted without unreasonable risk to the fisheries. His duty includes the obligation not to go forward with a lease sale in a particular area if it would create unreasonable risks in spite of all feasible safeguards. As we see it, the question is not whether the Secretary's task is to put the interest of fishing "above" everything else, on the one hand, or whether, on the other, he is mindlessly to lease every square foot of seabottom at whatever risk to other resources. Both the previous and amended Outer Continental Shelf Lands Act seem to us to reflect Congress's underlying belief that mineral development can be so orchestrated with the development and preservation of renewable resources like fish as to do no irreparable harm to them. It is left to the Secretary to harmonize the interests of the various resources wherever they impinge upon one another. Congress nowhere simplified his difficult task by attaching overriding priority to the extraction of mineral wealth alone. We see no evidence that Congress sanctioned the destruction of a fishery as an acceptable price for oil and gas development. Some adverse effects on fishing and the coastal environs were doubtless anticipated, as the legislative establishment of oil spill and fishermen's gear funds indicates; but we think the underlying assumption was that both sets of interests—those concerned with the preservation of the fishery resource for future use by mankind, and those concerned with securing the extraction of oil and gas—can be served. Where the two sets of interests conflict, where particular mineral leases threaten particular fishing interests, the Secretary must determine which interests must give way, and to what degree, in order to achieve a proper balance. Thus in a case where a particular drilling operation poses too great a threat to a fishery, the Secretary must refuse to permit it. By the same token, if the threat is relatively small, and the damage posed to fishing of no major consequence, the Secretary may determine that leasing should proceed even if some harm may result. But the concept of balance rules out a policy based on sacrificing one interest to the other.

In arguments made under the Outer Continental Shelf Lands Act before the 1978 amendments, the Secretary conceded a "duty to consider fully the adverse impact

of his activities under the Outer Continental Shelf Lands Act on the fisheries and to act with reasonable regard to those fisheries" but tended to be coy about admitting to any "affirmative duty on the Secretary to not affect fish in OCS oil and gas activities." He would not agree that the Act *commanded* that he regulate the oil and gas activities so as to maximize the harmony with fishing—rather he said merely he was *empowered* to do so. We would have ruled that the Secretary took too restricted a view of his duties even under the far from explicit standards of the unamended Act. Under § 5(a)(1) as then written, the Secretary's power to take measures to prevent waste and conserve natural resources was prefaced with the word "may," but we think the word as there used was not inconsistent with imposition of a duty. "Where a statute confers a power to be exercised for the benefit of the public or of a private person, the word 'may' is often treated as imposing a duty rather than conferring a discretion." *United States ex rel. Siegel v. Thoman,* 156 U.S. 353, 359, 15 S.Ct. 378, 380, 39 L.Ed. 450 (1895); *Supervisors v. United States,* 71 U.S. (4 Wall.) 435, 18 L.Ed. 419 (1867); *Mason v. Fearson,* 50 U.S. (9 How.) 248, 13 L.Ed. 125 (1850); *Thompson v. Clifford,* 132 U.S.App.D.C. 351, 355, 408 F.2d 154, 158 (1968).

In our view, by conferring powers upon the Secretary to provide for "the prevention of waste and conservation of the natural resources of the Outer Continental Shelf," Congress had indicated, even in the earlier legislation, a serious concern with balanced use of all resources in the area. To grant such powers indicated an expectation that reasonable use would be made of them for their intended purpose. Selection of the word "may" reflected Congress's recognition that because of the unforeseeability of the problems that would arise, the Secretary had to have broad discretion in the choice of means. But we feel the provision implied an underlying duty to exercise due diligence that the resources be in fact protected. *United States ex rel. Siegel v. Thoman, supra.* Such a duty would be in keeping with the longstanding view of the Sec-

retary as "the guardian of the people of the United States," who is bound to see that "none of the public domain is wasted or is disposed of to a party not entitled to it." *Knight v. United States Land Association,* 142 U.S. 161, 181, 12 S.Ct. 258, 264, 35 L.Ed. 974 (1891); *see Hannifin v. Morton,* 444 F.2d 200, 202 (10th Cir. 1971); *Sierra Club v. Department of Interior,* 398 F.Supp. 284 (N.D.Cal.1975). It would be also consistent with the legislative history, which nowhere suggested that Congress expected or desired oil and gas leasing to go forward under conditions, or in particular locations, where serious and permanent damage to other important resources would result. The Act was never framed so as to mandate the singleminded exploitation of oil and gas resources at the expense of other important resources. Rather it couched the Secretary's power to enter into oil and gas leases in discretionary terms, 43 U.S.C. § 1337, leaving him free to withhold from leasing those areas where drilling operations would not be in the public interest, either because too dangerous to the marine environment or for some other reason. *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). The Secretary could withhold specific lease areas in the interest of the proper management of all resources, just as he was empowered under § 5(a)(1) to condition leases on proper safeguards.

This interpretation of the unamended Act also drew sustenance from the enactment, in 1976, of the Fishery Conservation and Management Act. If the Outer Continental Shelf Lands Act were read as empowering the Secretary to give absolute priority to the extraction of oil and gas without paying heed to possible destructive effects upon the Georges Bank fishery, one federal statute would be read as countenancing the destruction of a resource which another, later statute was enacted to preserve. Common sense dictates that two statutes be read, insofar as possible, in harmony with one another.

"Statutory interpretation requires more than concentration upon isolated words; rather, consideration must be given to the

.total corpus of pertinent law and the policies that inspired ostensibly inconsistent provisions." *Boys Markets v. Retail Clerks Local 770,* 398 U.S. 235, 250, 90 S.Ct. 1583, .1592, 26 L.Ed.2d 199 (1970).

The Fishery Conservation and Management Act was enacted in large part to protect the very resource here at stake, the Georges Bank fishery. Among the Act's purposes is "to promote domestic commercial and recreational fishing under sound conservation and management principles . . . ." 16 U.S.C. § 1801(b)(3).[12] The Fishery Act is thus no less an assertion of a federal interest in conserving the fishery resources in the waters of the Outer Continental Shelf than was the earlier Outer Continental Shelf Lands Act an assertion of a federal interest in developing the oil and gas wealth of the subsoil and seabed in the same area. To give effect to both policies, both Acts have to be construed in such a way as to minimize any conflict. A construction allowing oil and gas exploitation to take absolute priority over fishing would be to sanction a schizophrenic national policy, in which one hand was busily at work undoing what the other was seeking to accomplish.

For us to construe even the unamended Outer Continental Shelf Lands Act as requiring the Secretary to manage the resources committed to his care in such a way as to avoid serious harm to the fisheries was also consistent with policies laid down in the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.,* which contains the following statement:

"The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological ad-

vances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation , with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."

42 U.S.C. § 4331(a). This statute makes clear a national commitment to the intelligent use of all our natural wealth, which requires responsible federal officials to balance the benefits to be gained from the exploitation of one resource against the possible harm that may accrue to others.

Thus even prior to the 1978 amendments, we think it clear that the Secretary had a legal duty to avoid unreasonable risks to the fisheries in waters over the Outer Continental Shelf, even to the point of refusing to lease particular areas where risks would be unreasonable. We agree with plaintiffs that this duty has now been spelled out in the 1978 amendments, which contain numerous provisions indicating that the Secretary is required to minimize or eliminate any conflict associated with the exploitation of oil and gas resources. 43 U.S.C. § 1801(13); *see also* § 1332. To be sure, the amendments also reflect congressional desire to expedite the development of the oil and gas resources; but clearly Congress intends that this be done without serious damage to "the renewable resources of the Outer Continental Shelf which are a continuing and increasingly important source of

---

**12.** Preservation of the offshore fisheries was of such importance that Congress was willing to take the major foreign policy risk of excluding foreign fishing fleets from the high seas over the Outer Continental Shelf; henceforth the fish there came under United States protection

and management. If there had formerly been any doubt of the importance placed on the fisheries *vis-a-vis* other resources, enactment of the Fishery Conservation and Management Act dispelled that.

food and protein to the Nation and the world." 43 U.S.C. § 1801(14).

It is thus left to the Secretary to develop policies that will result in the extraction of oil and gas without unreasonable risks and damage to renewable resources such as fish. If it were 100% certain that particular precautions would obviate all danger, the task would be simple; but there is a large element of the unknown created by gaps in science, by possible human error, and by freak weather conditions. Thus, the Secretary must engage in an uneasy calculus akin to that described by Judge Learned Hand, weighing "the probability" of accident, "the gravity of the resulting injury" and "the burden of adequate precautions." *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947). This task is committed to the Secretary, and so long as he carries it out rationally and in conformity to the law, the courts may not intervene. There can be no question, however, that his legal duty embraces a solemn responsibility to see that the great life systems of the ocean are not unreasonably jeopardized by activities undertaken to extract oil and gas from the seabed.

*The preliminary injunction is vacated and the case remanded for further proceedings not inconsistent herewith.*