CONSERVATION LAW FOUNDATION
OF NEW ENGLAND, INC. et al.,
Plaintiffs, Appellants,

v.

Cecil D. ANDRUS, etc. et al.,
Defendants, Appellees,

Atlantic Richfield Company et al.,
Intervenors, Appellees.

COMMONWEALTH of MASSACHU-
SETTS, Plaintiff, Appellant,

v.

Cecil D. ANDRUS, etc. et al.,
Defendants, Appellees,

Atlantic Richfield Company et al.,
Intervenors, Appellees.

Nos. 79–1585, 79–1586.

United States Court of Appeals,
First Circuit.

Argued Dec. 6, 1979.

Decided Dec. 17, 1979.

See also, 1 Cir., 594 F.2d 872.

Frederick Small, and Kenneth T. Hoffman, Cambridge, Mass., were on brief, for appellants in 79–1585.

Stephen M. Leonard, Asst. Atty. Gen., Francis X. Bellotti, Atty. Gen. and Jose R. Allen, Asst. Atty. Gen., Boston, Mass., were on brief, for appellant in 79–1586.

Maryann Walsh, Atty., Dept. of Justice, Washington, D. C., with whom James W. Moorman, Asst. Atty. Gen., Peter R. Steenland, Jr., William M. Cohen, Michael W. Reed and Patricia Young, Attys., Dept. of Justice, Lawrence R. Hoese, Dept. of Interior and John A. Milholland, Dept. of Commerce, Washington, D. C., were on brief, for federal appellees.

Allen P. Rubine, Deputy Atty. Gen., Providence, R. I., with whom Dennis J. Roberts, II, Atty. Gen., Providence, R. I., was on brief, for the State of Rhode Island, J. Joseph Garrahy, Governor intervenor appellee.

E. Edward Bruce, Washington, D. C., with whom Mark D. Nozette, Covington & Burling, Washington, D. C., G. M. Moriarty, Ropes & Gray, Boston, Mass., I. Berry St. John, Jr., and Liskow & Lewis, New Orleans, La., were on brief, for intervenor-appellees Atlantic Richfield, et al.

Neil L. Lynch, Boston, Mass., Chief Counsel to the Governor, Edward L. Selgrade, Boston, Mass., and Paul T. Gilrain, Swampscott, Mass., on brief for Edward J. King, Governor of the Commonwealth of Massachusetts amicus curiae.

Harrison A. Fitch, Boston, Mass., on brief for New England Legal Foundation the New England Council, the Greater Boston Chamber of Commerce, The Greater Providence Chamber of Commerce, and the New Bedford Chamber of Commerce in support of appellees, amicus curiae.

Douglas I. Foy, Boston, Mass., with whom Sarah M. Bates, Alan Wilson, Boston, Mass.,

* Of the District of Massachusetts, sitting by designation.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and ZOBEL,* U. S. District Judge.

COFFIN, Chief Judge.

This opinion is the third in a series of opinions by this court concerning the litigation which has resulted from the attempts of the Secretary of the Interior to lease tracts for oil and gas exploration, development, and production on Georges Bank through proposed Outer Continental Shelf (OCS) Lease Sale 42. The prior history of this litigation and a description of the underlying facts concerning the Secretary's actions are set forth in our previous opinion, *Massachusetts, et al. v. Andrus, et al.*, 594 F.2d 872 (1st Cir. 1979). This particular opinion is addressed to the issues raised by an appeal from the November 6, 1979, order of the district court denying a motion for a preliminary injunction against the holding of the lease sale.

Following the original opinion of this court, the Secretary produced a First Supplemental Environmental Statement (FSES) and eventually rescheduled the sale of leases for November 6, 1979. The Commonwealth of Massachusetts (Massachusetts) and the Conservation Law Foundation of New England, Inc. (CLF), appellants in this case, asked the district court to enjoin this sale, which it refused to do on November 5, 1979. Appellants immediately filed an appeal from that denial and requested this court to issue a stay pending resolution of the appeal. After an expedited, foreshortened hearing we refused to grant the stay pending appeal, but granted a short stay preventing the Secretary from opening bids until 2:00 p. m., on November 6, 1979. Before the sale could be held, however, Circuit Justice Brennan continued our stay. The Supreme Court subsequently vacated the stay on November 9, 1979. Since, as a result of Justice Brennan's stay, the date of the sale had passed without an opening of the bids, the Secretary was required to re-notice and reschedule the sale.

The new sale date was set for December 18, 1979.

As we indicated in our previous opinions, in order for appellants to convince us to reverse the district court's denial of the preliminary injunction, they must establish that the district court opinion was clearly erroneous or clearly the result of an error of law. Since the district court ruled that appellants had not demonstrated a probability of success on the merits, a traditional factor required for the issuance of a preliminary injunction, appellants focus their arguments on this appeal on the merits of their case. They put forward three main arguments to support their claim that the district court clearly committed an error of law in judging the likelihood of success on the merits. We shall address each of these arguments in turn.

## I. Endangered Species Act

Appellants assert that the lease sale will violate section 7(d) of the Endangered Species Act, 16 U.S.C. § 1536(d). Section 7(d), Limitation on Commitment of Resources, provides that the Secretary cannot

> make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would avoid jeopardizing the continued existence of any endangered or threatened species
> . . . . .

Appellants claim that the prohibited "irreversible or irretrievable commitment of resources" will occur when the sale of leases is held.[1] They support this claim by reasoning that once the Secretary sells the leases, he can cancel them only pursuant to the standards of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.* (1978) (OCSLA), specifically, §§ 1340(c)(1)

---

1. There is some dispute among the parties as to whether the § 1536(a) consultation process is in fact still ongoing, which is a required condition for triggering the § 1536(d) [§ 7(d)] provisions. Our disposition of the appellants' argument, however, avoids the necessity of reaching this issue. Similarly, we need not address interve-

nors-appellees' contention that the OCSLA standards are a "reasonable and prudent alternative measure" which is not foreclosed by the lease sale, nor the government's argument that the standards of the two acts are not in fact different.

and 1334(a)(2)(A). These standards, appellants argue, are less stringent than those of the ESA.[2] Thus, appellants continue, the resource which will forever be lost once the sale is held is the ability of the Secretary to apply the strict standards of the ESA.

The district court rejected this argument by reasoning that if there were any difference between the OCSLA and ESA standards, the lease stipulations included in the notice of sale, which conditions any rights acquired by successful lease applicants, eliminated the difference by securing authority for the Secretary to regulate post-sale activities. In our opinion announcing our denial of the request for a stay pending this appeal, we indicated that we were inclined to agree with the district court's reasoning on this point.

Appellants now contend that with the brief additional time which we have for deciding this appeal, we should see that the lease stipulations do not in fact close the gap between the ESA and OCSLA standards. We now find, however, that we need not address this issue. The Secretary points out that appellant's argument is based on the assumption that the ESA and OCSLA are mutually exclusive. This assumption, the Secretary contends, is incorrect—the standards of these two acts are complementary, and the ESA will continue to apply of its own force to major actions taken by the Secretary after the lease sale is held. Thus, the Secretary claims, if he cannot, for example, insure that exploration will not jeopardize the continued existence of the right and humpback whales, he will not approve exploration plans.

We find this argument by the Secretary to be persuasive. The ESA by its terms applies to all action by the Secretary. Therefore, any contract which he enters into ( e. g., a lease) which requires a future action on his part (e. g., approval of plans) will contain as an implied term a condition that the Secretary will behave lawfully (e. g., not violate the ESA). This reasoning is simply an example of the basic rule of contract law that contracts generally will not be interpreted so as to render them illegal. This focus on contract analysis is appropriate since appellants' whole argument rests upon an assumption that when the government sells the leases, the purchasers will acquire as part of the transaction the right to claim that the government is bound by the terms of the lease. This assumption is reasonable, but it begs the precise question what the terms of the lease are. Specifically, do they include an assumption that the Secretary will comply with the ESA when he takes further actions?

■ The correctness of the Secretary's contention is underscored by the fact that the strictures of the ESA apply to lease applicants as well as the government. Thus, under the ESA both the Secretary and the lease applicants have certain obligations which can be fulfilled without abrogating any explicit terms of the leases.

We recognize, of course, that the notice of sale does not explicitly state that the ESA standards will apply when appropriate. Neither do they explicitly state the contrary. This lack of clarity might possibly have led unhappy lessees to claim at a later date that the Secretary could not apply ESA standards. Our agreement with the Secretary's interpretation of the relationship between the ESA and OCSLA, however, effectively forecloses any such argument.[3]

---

2. The ESA provides that the Secretary shall "insure that any action does not jeopardize" an endangered species. The OCSLA standards provide that the Secretary shall approve exploration plans within 30 days from the date they are submitted by lessees unless he finds that the plans would "probably cause serious harm or danger to life."

3. Appellants argue that this interpretation of the relationship between the statutes converts the ESA into "a grant of authority to reverse commitments after they are made", and thus changes the meaning of the statute beyond recognition. Again, however, appellants are begging the question. The question we are addressing is what is the nature of the commitment, not whether it can be reversed.

We therefore find that the district court did not abuse its discretion in holding that the plaintiffs had not demonstrated a probability of success on the merits on the ESA issue.

## II. NEPA

Appellants' second main argument on the merits is directed at the environmental statements issued by the Secretary. Appellants claim that these statements are deficient in numerous respects and violate the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* (1976) (NEPA).

In appraising the criticisms which appellants direct to the sufficiency of the Final Supplement to Environmental Statement (FSES) and the Secretary's responses to their comments, we bear in mind the historical context. This statement was not the first or only environmental statement prepared; had it been, appellants' complaints about unseemly haste might be more compelling.

It seems to us helpful to recall that in our earlier opinion we discussed the several deficiencies in the "Final Environmental Statement" (FES) found by the district court, laying particular stress on our perception of the need to "focus additional attention upon the question of whether or not there are any portions of Georges Bank so uniquely valuable that they should be singled out for this special protective [marine sanctuary] status." 594 F.2d at 885. Although we specifically refrained from passing on the need for a supplemental environmental statement, *id.* at 886, the Secretary, three months after our decision was issued, had prepared and, on May 22, 1979, issued a draft supplemental environmental statement (DSES). He distributed 700 sets of this draft and called for comments in 8 weeks. In addition, a public hearing was held on June 20 at which 45 witnesses made presentations.

On August 3 the FSES was issued, with some 400 pages of text and 300 pages of appendices. The broad scope of the Secretary's inquiry is suggested by the 9 chapter headings.[4] We also bear in mind that this document was intended to add to, not replace, the earlier 5 volume FES. The FSES stated that all comments, whether of drafting or of substance, had been analyzed and that it reflects "wherever possible" the consideration given substantive issues. In particular, the FSES separately itemized and responded to 38 issues.[5]

It is against this background that we try to identify the remaining NEPA issues and weigh their criticality. To begin with, we recognize that changes in plans to which the Secretary has agreed meet some of NOAA's earlier objections. The deletion of the 12 tracts nominated by NOAA, the amendment of stipulation number 4 to allow barging of drill muds and cuttings to an on-shore site, the requirement of on-site pollution control equipment, and changing stipulation 2 to authorize the requirement that lessees conduct environmental condition studies have substantially diminished the area of controversy.

To identify all remaining issues relating to the adequacy of the FSES and the Secretary's response to comments, we have combed the briefs, the comments, the FES and FSES. Our search has identified 8 separate alleged deficiencies in the two documents. In each instance, the alleged deficiency consists of purported failure to acknowledge or respond to criticisms voiced by NOAA in its comments submitted at the conclusion of the public hearings. We shall

4. 1. Description of the Proposal; 2. Description of the Environment; 3. Impacts on the Environment; 4. Mitigating Measures; 5. Adverse Environmental Impacts Which Cannot be Avoided Should The Proposal be Implemented; 6. Relationships Between Short-Term Uses of Man's Environment and Enhancement of Long-Term Productivity; 7. Irreversible and Irretrievable Commitment of Resources (5, 6, and 7 being principally covered in the FES); 8. Alternatives to the Proposed Action; and 9. Consultation and Coordination with Others.

5. Of these, 3 were raised by appellant Commonwealth of Massachusetts, 8 by appellant Conservation Law Foundation, 6 by both appellants, and 8 by National Oceanic and Atmospheric Administration (NOAA).

address each of these alleged deficiencies individually.

1. At an earlier stage of this litigation, the district court ruled that the FES was deficient because it failed to make any reference to the alternative of designating Georges Bank as a marine sanctuary. The district court indicated that this failure might have caused the Secretary to disregard the benefits that could result from application of the Sanctuaries Act.

On the appeal from this original ruling, we indicated that it might in fact be reasonable to require the Secretary to discuss the marine sanctuaries alternative. Subsequently, the FSES was drafted and directed for the most part at a discussion of sanctuaries alternatives. Simultaneously, NOAA conducted hearings on CLF's nomination of the Georges Bank area as a sanctuary. The Secretary entered into consultations with NOAA on this subject, promulgated these stipulations aimed at NOAA's primary concerns, and prepared an additional paper, the Secretarial Issue Document (SID), discussing the sanctuaries alternative. NOAA then announced that it was withdrawing consideration of the sanctuaries nomination and that the Secretary's adoption of various safeguards, such as the lease stipulations, "was a fundamental element in our decision."

Appellants now claim that the discussion of the marine sanctuary alternative in the FSES is inadequate. Whether or not the entire issue of the sanctuaries alternative has been *mooted* by NOAA's decision we need not decide.[6] The lengthy discussion of the alternatives in the FSES, together with the consultation with NOAA certainly demonstrate that the objective of identifying and seriously considering reasonable alternatives has been achieved.

2. Appellants assert a failure to determine the cost of the alternative of "no action", i. e., not proceeding with the lease sale. In this instance, both NOAA's complaint and appellants' claim are at best strained. The cost of the alternative of not proceeding is obvious—any oil which might be found will not be found. The expected amounts which would thus be lost are set forth in the FSES at 266 and more thoroughly in the FES. Moreover, NOAA itself calculated the anticipated net dollar value of the oil thought to be under Georges Bank and these calculations are incorporated into the FSES.

3. In its comments, NOAA asserted that the FSES and FES do not take into account the stressed nature of some of the fish stock in determining the possible damage of an oil spill. Appellants claim that there is no response to this comment. The basis of the comment itself, however, is mistaken. The FES does take into account the "severely depressed" nature of the haddock stock and concedes that the stress factor might result in any damage to the stock by an oil spill being permanent. FES at 871.

4. Appellants assert that there is no response to NOAA's comment that the FSES underestimates the problems which could be caused by formation waters and relies too much on EPA guidelines. The comment itself, however, is not well taken. The FSES relies upon various empirical studies in addition to the EPA guidelines and the discussion of formation waters is fairly detailed. FES 773–776, FSES 154–159. While the comment is included in the FSES, not every comment merits an individual response. 40 C.F.R. 1500.10(a) (1978), 1500.-2(b), 1500.7(a). Moreover, it is absolutely clear that the Secretary is aware of and has considered seriously the problem of formation waters. Direct consultations with NOAA were held on the subject and stipulations were subsequently drawn up and incorporated into the FSES.

6. Appellants attempt a collateral attack on the FSES by asserting that the decision of NOAA to withdraw the Georges Bank from active consideration as a nominee for sanctuary designation was made in bad faith. Even if this attack were relevant, we see nothing which would cause us to inquire into the motives of NOAA's decision and note only that its decision not to pursue the nomination further is in no way inconsistent with *its* criticism of the *Secretary's* decision to conduct the lease sale.

5. NOAA claimed in its comments that the FES and FSES failed to consider the effects which increased turbidity, caused by pipe dredging, might have on photosynthesis. Appellants claim there is no adequate response to this comment.

This comment, however, which consisted of three sentences without any citation to scientific authority, did not merit any individual response beyond what was already in the FES. At several places in the FES, it is pointed out that the pipe dredging will not cause any significant increase in turbidity (771, 896, 897). Thus, the FES in effect indicates that the assumption upon which the comment is based—increased turbidity—is not correct. Since NOAA offered no evidence to the contrary, there is no need for the FES to discuss the issue any further.

6. Appellants claim that the FES does not place a dollar value on the recreation industry which could be affected by an oil spill. While we largely considered and rejected a similar claim in our first opinion concerning this litigation, 594 F.2d at 884, we note in addition that the FSES at 300 and the FES at 1070–89, 1012–1016 discuss the recreation industry, its importance to the area, the dangers which a spill poses to it, and studies of the effect in dollars which oil spills have had on comparative areas. We do not see how placing a separate dollar value on the entire industry in the region would have improved this discussion in any relevant manner, since there is no suggestion at all that the entire industry as a whole would be endangered. In any event, the failure to do so is certainly not cause to rule that the district court abused its discretion in determining under the rule of reason, see *Sierra Club v. Froehlke*, 534 F.2d 1289 (8th Cir. 1976), that it was not likely to find the environmental statements defective.

7. In a lengthy discussion of problems caused by the drilling process, NOAA in its comments included one paragraph criticizing the FES and FSES for not discussing the possibility that drilling fluids might compete with aquatic life for oxygen in the water. Appellants claim that there is no response to this particular point in the final documents. While there are extremely detailed and lengthy discussions of the numerous complicated problems presented by the drilling process, there is no explicit mention of the particular hypothesized danger posed by NOAA.

It is clear, however, that the preparation of the FSES was based in part on an examination of a wide range of theoretical and empirical studies of the problem. Moreover, the Secretary consulted with NOAA officials on the specific issue of problems caused by drilling and subsequently promulgated lease stipulations which NOAA cited as fundamental factors in its decision to withdraw Georges Bank from active consideration as a marine sanctuary. This fact, together with the fact that NOAA's comments were included in the FSES, demonstrates that the Secretary was aware of any possible problems in this area, considered them seriously, and was not attempting "to sweep them under the rug."

8. Finally, appellants point to the failure of the documents to respond to the comment by NOAA that there is inadequate consideration of the effect which the peculiar hydrography of Georges Bank might have on the extent of the damage which chronic discharges might do to the area. While the FSES contains a discussion of the dangers posed by chronic discharges and the FES has a lengthy analysis of the complicated and in some cases uncertain currents in the Georges Bank area, there is, as appellants claim, no explicit joint consideration linking the two factors.

We note, however, that NOAA itself attributed no special significance to this issue in mentioning it. Moreover, as we indicated previously, the Secretary's consultations with NOAA resulting in the lease stipulations were on the subject of disposal of drill cuttings, drill muds, and formation waters, the major source of chronic discharges. That is, to the extent such materials are barged to an on-shore site, to the same extent is the threat of localized buildup of chronic discharges reduced. Thus, to the extent that failure to explicitly address the issue in the FSES can be characterized

as a "defect", we find it nevertheless insufficient to overturn the district court's ruling on the preliminary injunction motion.

\* \* \* \* \* \*

■■ We conclude this part of our opinion by noting the several formidable hurdles that must be overcome by litigants seeking, on NEPA grounds, to obtain reversal of a district court's denial of a preliminary injunction. In the first place, the standard to be applied in judging NEPA statements is a reasonableness standard, *Sierra Club v. Froehlke, supra*, 534 F.2d at 1289, aimed at insuring a good faith effort by the Agency. *Silva v. Lynn*, 482 F.2d 1282 (1st Cir. 1973). In applying this standard in this case, the district court did not abuse its discretion. Secondly, even if there is some minor deficiency in an environmental statement, the presence of such does not suffice to dispense with the traditional role of the court in balancing competing consideration. *Essex Ct. Preservation Ass'n v. Campbell*, 536 F.2d 956, 960–61 (1st Cir. 1976). Thirdly, the scope given the discretion of the district court in granting or denying a preliminary injunction is a further limitation on the proper exercise of power by a reviewing court. Finally, as we have earlier pointed out, the fact that this has been a lengthy and hard fought litigation cannot fail to have resulted in the disappearance of old targets and the emergence of new ones, the focus being ever more narrow and of less overall significance.

We hold, therefore, that the district court did not abuse its discretion in finding no probability of success as to appellants' NEPA claims.

## III. BAST Regulations

■ Under the OCSLA, 43 U.S.C. § 1347(b), the Secretary is obliged to

require, on all new drilling and production operations . . . the use of the best available and safest technologies [BAST] which [he] determines to be economically feasible, wherever failure of equipment would have a significant effect on safety, health, or the environment, except where [he] determines that

the incremental benefits are clearly insufficient to justify the incremental costs of utilizing such technologies.

Appellants argue that the failure of the Secretary to initiate a prompt study of BAST, to promulgate regulations setting parameters which would govern the identifying of such technologies or otherwise to define them violates OCSLA. Particularly, appellants urge the importance of requiring the most comprehensive and stringent BAST to Georges Bank lessees because of the uniqueness of the area, and they argue the sale should be enjoined until such regulations are promulgated.

We know of no authority which would support enjoining the lease sale until BAST regulations are promulgated. Section 21(b) of the OCSLA, 43 U.S.C. § 1347(b), states only that "the Secretary . . . shall require . . . the use of [BAST]." Both the OCSLA and the notice of sale clearly provide that whatever BAST regulations the Secretary promulgates will apply to preexisting leases. There is no suggestion at all that these regulations must be promulgated before the sale is held. Indeed, as we indicated in our opinion denying the stay pending appeal, the statutory scheme providing for retroactive application of BAST regulations indicates that the Secretary's duty to develop the regulations is an ongoing process which allows for flexible, changing standards as the available technology evolves.

We therefore reject this argument by appellants as well—the district court did not abuse its discretion in judging the likelihood of success on the merits concerning this point.

Finally, appellants continue to attack the environmental statement for failure to discuss the so-called Bay of Campeche incident. For the reasons stated in our opinion of November 6, 1979, we reject this claim as well.

While we affirm the district court's denial of a preliminary injunction, we wish to emphasize two matters which may not be immediately clear.

■ First, while the denial of preliminary relief leaves it open to the Secretary

to enter into lease agreements, as he apparently plans to do tomorrow, these leases will be issued subject to the district court's later decision on the merits of the pending lawsuit. As stated by Judge Robinson of the District Court for the District of Columbia in his recent decision in *North Slope Borough, et al. v. Andrus, et al.*, 486 F.Supp. 328

> "Plaintiffs contend that the standards for cancellation of existing leases by the Secretary under 43 U.S.C. § 1334(a)(2)(A)(i) may preclude cancellation by him until after significant damage to the environment. Those standards, however, will not govern this Court's determination of whether the Secretary's issuance of the leases was proper under NEPA, the ESA and the other statutory provisions on which Plaintiffs rely. Rather the filing of this suit acts as a *lis pendens* on the lease sale. The issuance of leases may in fact restrict the Secretary's options as Plaintiffs contend, but it does not restrict this court's options in judging the validity of those leases should the Secretary determine to issue them after assessing the obligations imposed on him by statute."

It is true here as in that case, that major drilling activities with the potential for creating serious harm to the environment are unlikely to have occurred prior to a decision on the merits. While, therefore, the parties and the district court seem to have assumed that denial of preliminary relief will cause irreparable harm, we now question that assumption. As Judge Robinson points out in his case, the filing of this suit acted as a *lis pendens*, and the district court's options remain fully open should it later be persuaded that the Secretary's decision was infected by some illegality.

Second, our present decision does not foreclose further consideration by the district court of issues raised by plaintiffs, including the issue of the adequacy of the environmental statements.[7] Our present ruling is merely that based on our limited

opportunity for review in the brief period afforded us, we are not persuaded that plaintiffs have demonstrated a probability of success on the merits. Plaintiffs continue to be entitled to try to demonstrate to the district court, at the proceeding on the merits, that the district court and we ourselves have overlooked or misread certain determining aspects of the environmental reports. They are also free to pursue their argument that the Secretary has violated his mandate to avoid creating an unreasonable risk of harm to the Georges Bank fishery. We do not mean to hold out unrealistic hopes in this regard, but especially in view of the short time that this court has had to review the voluminous materials forming the background of the Secretary's action, we think it important that our present opinion not be confused with a definitive and final ruling on the merits.

*The judgment denying a preliminary injunction is affirmed.*

---

**7.** The matter of whether the BAST regulations had to be promulgated *before* leases could be granted raises a legal question which our decision finally resolves against plaintiffs. The same is true of the argument that granting leases at this time violates the Endangered Species Act.