William M. DORN, Michael J. Tasos, Mark Ludwig, Stephen J. Walton, Jennifer Shore, and Rhonda L. Campbell, Plaintiffs,

v.

ASTRA USA, Lars Bildman, George Roadman, Robert Vogel, Edward Aarons, Charles E. Yon, and David Frons, Defendants.

Civ. No. 96–11124–MEL.

United States District Court, D. Massachusetts.

July 30, 1997.

John J. Kuzinevich, Isaac H. Peres, Kuzinevich & Miller, P.C., Boston, MA, Richard W. Bland, II, Framingham, MA, for William M. Dorn, Michael J. Tasos, Mark Ludwig, Stephen J. Walton, Jennifer Shore, Rhonda L. Campbell.

Richard L. Alfred, Joshua M. Davis, Robert F. Schwartz, Hill & Barlow, Boston, MA, for Astra USA, Robert Vogel, Charles E. Yon, David Frons.

Roderick MacLeish, Jr., Treazure R. Johnson, Robert G. Najarian, Jr. Eckert, Seamans, Cherin & Mellott, Boston, MA, for Lars Bildman.

Oliver C. Mitchell, Jr., Diane Rubin, Goldstein & Manello, P.C., Boston, MA, for George Roadman.

LASKER, District Judge.

Plaintiffs, former employees of Astra USA ("Astra"), sue Astra and six individual defendants on several counts arising out of alleged direct and indirect sexual harassment, retaliation, and concealment of such activities planned and executed by Astra's high level executives. Defendants Astra, Bildman, Roadman, Aarons, Frons, Vogel and Yon move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted, on various grounds including that plaintiffs have ratified settlement agreements with the defendants and accordingly have waived their claims.

The motion is granted.

## I.

The following allegations of the complaint are accepted as true for the purposes of this motion. Plaintiffs Dorn, Tasos, Ludwig, Watson, Shore and Campbell were employees of Astra USA[1] at various intervals between March 1991 and June 1995. Defendant Yon is Astra's General Counsel, Vogel and Frons are Astra's National Sales Manager and Assistant National Sales Manager,

respectively and Aarons and Roadman were Senior Vice Presidents at Astra. Lars Bildman was Chief Executive Officer of Astra USA from the early 1980's until 1996. Bildman's "militaristic" and abusive management style led plaintiffs to believe that Bildman and his management team had "absolute control" over the day to day activities at Astra. Within one year of Bildman's arrival at Astra, the company began to replace female secretaries and assistants who were over age 40 or married with children with females between the ages of twenty and thirty. By 1990, Bildman was requiring every new sales representative, typically "an attractive young woman just out of college", to attend nightclubs or bars with him and other top executives as part of the Astra "training program." Trainees were required to attend the "Astra" bar every night of the nine-week program. At the bar, female trainees were "picked up ... fondled, rubbed ... and propositioned for sexual intercourse" by Astra's top executives. Those who resisted their advances worried about their jobs; those who complied advanced rapidly. Higher level employees were not immune from the "Astra Way." Between 1992 and 1994, up to fifteen middle managers were fired under the pretext of poor performance for objecting to the harassment of women at Astra.

William Dorn was National Sales Manager of Astra's Hospital Division from June 1992 to June 1995. In June 1993, Dorn received complaints that Bildman and Aarons had sexually harassed a sales representative in his division. In compliance with Astra's sexual harassment policy, Dorn reported the matter to Yon and Astra's Director of Human Resources, and told them he would not tolerate such activities as long as he was responsible for the sales force. Shortly thereafter, Vogel threatened to fire Dorn if he "interfered with Bildman's bedroom affairs again." Two years later, Dorn was fired. Executives

---

1. Astra USA markets hospital and outpatient products in the United States and is a wholly-owned subsidiary of Astra AB, a Swedish pharmaceutical company with $2.8 billion in gross sales and approximately thirteen thousand employees worldwide. In a previous ruling by this court, the claim against Astra AB was dismissed on grounds that it had no duty to plaintiffs and that its corporate relationship with Astra USA was not sufficiently close to justify disregarding their separate identities. See *Dorn v. Astra U.S., Inc.*, No. 96–11124–MEL, 1997 WL 258491 (D.Mass. April 2, 1997).

claimed he had "too much morality" for Astra, and that unless he signed a settlement agreement and release of all claims against Astra, he would be "out of a job and out on the street without any money." Dorn and his wife signed a settlement agreement for seven months pay and a release waiving all claims against Astra. Dorn was advised to consult an attorney and was given three weeks to review the document before signing it and had seven days to revoke the agreement after its execution.

Mark Ludwig was Astra's Chicago, IL District Manager from March 1991 to March 1994. On or about November 17, 1993, Ludwig reported to Vogel that Bildman, Aarons and Roadman had sexually harassed two of his subordinates at an Astra after-hours party. In December, Ludwig was told by Bildman and Vogel to "keep quiet" about the incidents. On January 9, 1994, Astra terminated Ludwig "without warning or negative comments about his performance." At the time of his termination, Ludwig and his attorney signed a settlement agreement for $14,153 and a release waiving all claims against Astra.

Stephen Walton was Astra's District Manager for an "expansion district" in New Jersey from September 1992 until February 1994. His district's performance was at the bottom of the rankings at number twenty-five, but he was assured by Astra's upper level management that his performance was "about par and improving." On February 24, 1994, Frons summoned Walton to a meeting and gave him an ultimatum: resign at once and sign a release or be terminated. After Walton's request to consult legal counsel was denied, he signed a settlement agreement for three months pay and a release waiving all claims against Astra. The following day, Frons and Vogel flew to Minneapolis to terminate the district manager ranked number twenty-four. Walton alleges that he was terminated solely because Astra "needed to justify its termination of the district manager ranked at number twenty-four who complained about Roadman's sexual harassment."

Michael Tasos was Astra's Atlanta, GA District Manager from May 1991 until July 1993. His district's performance was second best out of Astra's twenty-five districts. Jennifer Shore was a sales representative in Tasos' district and was being sexually harassed by Bildman. In June 1993, Bildman told Tasos to fire Shore. Tasos objected, saying that Shore's performance was average, and that whoever had sales below her would also have to be discharged. On July 23, 1993, Vogel called Tasos into a meeting and told him that he was not a "team player" and could either resign, be terminated, or take a demotion as a sales representative. Vogel also demanded that Tasos sign a settlement agreement or be "terminated on the spot." After Tasos' request for time to seek legal counsel was rejected, Tasos signed the agreement for five months pay and a release waiving all claims against Astra. He then "collapsed and had some kind of seizure" and was attended to by Astra personnel.

Jennifer Shore was an Astra sales representative from April 1991 to April 1994. From the beginning of her employment at Astra, she was the target of "extreme" sexual harassment by Bildman. The harassment included "surreptitious administration of drugs" to Shore so as to hinder her ability to resist Bildman's advances. As a result of the sexual harassment, Shore claims she became "anorexic and experienced grave emotional and psychological injury." She asserts that in early 1994, Astra (no specific defendant was named) threatened to ruin her chance at any other employment by revealing "highly personal" information about her unless she signed a release. Upon her termination, Shore and her attorney executed a settlement agreement and a release waiving all claims against Astra in exchange for a payment to her of $50,000.

Rhonda Campbell was an Astra salesperson from August 1992 to October 1994. Roadman insisted that Campbell act as his "chaperon" on his evening forays into nightclubs and private bars in order to "conceal his affairs with other sales representatives." Due to the extent of her knowledge of Roadman's conduct, Campbell feared for her future at Astra in spite of her excellent performance reviews and top sales prize. Upon hearing rumors in February or March 1994

that she and a manager would soon be terminated in order to "erase all corporate knowledge of Roadman's transgressions and confessions," Campbell alleges that she "became hysterical" and required immediate medical attention for "hyperventilation, hysteria, gastrointestinal reflex disorder, colitis and an anxiety attack." In October 1994, while Campbell was still under treatment for anxiety and colitis, Astra (no one is specifically named) offered to pay all of her medical bills provided that Campbell execute a settlement agreement and a release waiving all claims against Astra. She signed the agreement, but the actual circumstances of her departure from Astra are not clear. Due to her alleged disability, Campbell has not been able to work for the past two years.

On 13 May 1996, the culture of sexual harassment at Astra was publicly exposed by an investigative report in Business Week magazine. Plaintiffs filed suit against Astra on 30 May 1996, approximately one to three years after they had signed their respective settlement agreements.

## II.

Plaintiffs seek a declaratory judgment that their settlement agreements and general releases were void ab initio because they were entered into for an "illegal or improper purpose, namely, to cover up the sexual harassment" at Astra. In the alternative, plaintiffs argue that the agreements should be rescinded because they were obtained by coercion or duress. They also bring charges of negligence, civil conspiracy, defamation, wrongful termination, intentional interference with contractual relations, intentional infliction of emotional distress, violation of the Massachusetts Civil Rights Act M.G.L. c. 12, § 11I, and assault and battery against Astra and/or the various individual defendants[2]. Defendants respond that by accepting substantial and valuable consideration from Astra in exchange for executing their respective agree-

ments and failing to disavow the agreements within a reasonable time, plaintiffs have ratified the agreements and forfeited their right to rescind the contracts. Plaintiffs counter that the duress by Astra and its officers continued after the agreements were executed and that their fear of retaliation did not subside until the misconduct at Astra was publically exposed by the investigative report in Business Week magazine. Plaintiffs filed the present action approximately two weeks after the report was published and assert that they therefore repudiated the agreements within a reasonable period of time.

Defendants also argue that settlement of sexual harassment claims is not "illegal," and that plaintiffs' claims are barred by the exclusivity provisions of either the Massachusetts Fair Employment Practices Act M.G.L. c. 151B or the Massachusetts Worker's Compensation Act M.G.L. c. 152.

## III.

■ Although one may sympathize strongly with the plaintiffs if their respective allegations are true, as it is assumed they are for the purposes of this motion, nevertheless, their assertion that it is "illegal or improper" to settle sexual harassment claims in order to avoid adverse publicity is without foundation. Contracts generally will not be interpreted so as to render them illegal. *Conservation Law Foundation of New England, Inc. v. Andrus*, 623 F.2d 712, 715 (1st Cir.1979). Moreover, public policy favors the private settlement of disputes arising from allegations of employment discrimination. *Equal Employment Opportunity Commission v. Astra USA*, 94 F.3d 738, 744 (1st Cir.1996) (dealing with the public aspects of the subject matter of this very case, "[p]ublic policy strongly favors encouraging voluntary settlement of employment discrimination claims"), *aff'g in part* 929 F.Supp. 512 (D.Mass.1996) (holding that despite the invalidity of a provision prohibiting cooperation with E.E.O.C., "the remain-

---

**2.** Plaintiffs also argue that there is a question as to whether Massachusetts substantive law applies to this dispute. Since there has been no evidence introduced that Massachusetts law does not apply and it is plain from the alleged facts that all of the significant action in this dispute emanated from Massachusetts (Astra is head-

quartered in Massachusetts), I have applied Massachusetts law. Furthermore, although the issue has not been briefed, it is not unreasonable to assume that there is no significant interjurisdictional variation in the common law principle of ratification.

der of the settlement agreements are valid and enforceable ... and settling claimants waived their rights to further damages"); *Perez v. State of Maine,* 760 F.2d 11, 14 (1st Cir.1985) (voluntary settlement barred subsequent employment discrimination suit seeking additional remedy on identical issue); *Carson v. American Brands,* 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981) ("[I]n enacting Title VII, Congress expressed a strong preference for encouraging voluntary settlement of employment discrimination claims.") Although the alleged conduct of Astra's executives towards its employees was brutal, offensive and violative of the laws against employment discrimination in general and sexual harassment in particular, settlement of the claims does not outweigh the public policy favoring private settlement of disputes. In theory and in fact, all such settlement agreements arise out of and remediate misconduct on the part of one or more parties. Moreover, one public policy motive behind strict enforcement of such agreements is to encourage defendants to make offers of settlement as well as to discourage plaintiffs from repudiating valid contracts in search of greater compensation with a "heads I win, tails you lose" approach towards litigation. See *Ismert & Assoc., Inc. v. New England Mutual Life Ins. Co.,* 801 F.2d 536, 551 (1st Cir.1986). Lurid as is the conduct complained of here, an agreement entered into by legally competent parties, in some cases advised by counsel, disposing of the claims arising from such conduct is ordinarily binding on the signatories.

## IV.

 Regardless whether plaintiffs' agreements were obtained by duress, plaintiffs have ratified and affirmed their agreements with Astra. Ratification of a contract may be found under a variety of circumstances: (1) intentionally accepting benefits under the contract, (2) remaining silent or acquiescing in the contract for a period of time after having the opportunity to avoid it, or (3) recognizing the validity of the contract by acting upon it, performing under it, or affirmatively acknowledging it. *In re Boston Shipyard Corp.,* 886 F.2d 451, 455 (1st Cir. 1989). In the instant case, plaintiffs have ratified the agreements and waived the duress defenses in two ways: by accepting the benefits of their respective bargains and by waiting, respectively, between eleven and thirty-four months to disavow the agreements because of the alleged duress.

 Contracts induced by duress are voidable, not void; acceptance of benefits under an agreement ordinarily constitutes ratification. *Deren v. Digital Equipment Corp.,* 61 F.3d 1, 2 (1st Cir.1995); *Vasapolli v. Rostoff,* 39 F.3d 27, 35 (1st Cir.1994); *Abbadessa v. Moore Business Forms, Inc.,* 987 F.2d 18, 23 (1st Cir.1993); *Mariotti v. Moore Business Forms, Inc.,* 987 F.2d 18, 23 (1st Cir.1993); *Boston Shipyard,* 886 F.2d at 455. A party cannot retain the benefits received and at the same time escape the obligations imposed by the contract. See *Abbadessa,* 987 F.2d at 24; See *Mariotti,* 987 F.2d at 24; *Grillet v. Sears Roebuck Co.,* 927 F.2d 217, 220 (5th Cir.1991). Before a plaintiff may rescind his or her agreement, he or she must restore the status quo ante, that is, return the parties to the positions they held before they entered into the agreement. *Grillet,* 927 F.2d at 220. In *Deren,* plaintiffs signed releases waiving all claims against their former employer as part of a severance agreement. Three and one half years later, contending that the releases had been coerced, they brought suit. In deciding for the defendant, the Court of Appeals found that "for three and one half years after any claimed duress had passed, plaintiffs enjoyed the benefits of the bargain they now wish to avoid. During this time, they never sought to repudiate their agreements based on duress. Thus, whether or not the releases initially were secured through duress, plaintiffs ratified them by their subsequent conduct ... [B]y ratifying the releases, plaintiffs waived the claims they now attempt to assert." In *Abbadessa* and *Mariotti,* the Court made similar findings. In those cases plaintiffs wrote to counsel for Moore that "they believed they had been terminated without cause in violation of the established policies and procedures of Moore and that they had signed their letters of resignation under duress." Abbadessa and Mariotti argued that "they never received notice of the change of

policy, that they never received consideration for the new policy, and that New Hampshire law did not permit an employer to unilaterally modify conditions of employment to the detriment of an employee in the absence of new consideration to the employee." As to Moore's claim that they had released any right to sue, Abbadessa and Mariotti argued that "their respective resignation agreements were invalid because they signed the agreements under economic duress." In deciding in favor of the defendant, the Court noted that "both Abbadessa and Mariotti accepted the benefits the agreements conferred on them and neither of them attempted to repudiate the agreements promptly." Even after they filed suit against Moore, "at no point did [Abbadessa or Mariotti] attempt to return to Moore the benefits of the agreements which they claim they signed under duress." Accordingly, both Abbadessa and Mariotti had ratified their respective agreements with Moore. As I read these decisions, they compel the conclusion that plaintiffs in the instant case have ratified their respective agreements with Astra. Each of the plaintiffs here accepted significant benefits in exchange for a release of all claims against Astra Dorn received seven months pay, Ludwig fourteen thousand, one hundred and fifty-three dollars ($14,153), Walton three months pay, Tasos five months pay, Shore fifty thousand dollars ($50,000) and Campbell payment of all her medical bills. Since none of the plaintiffs has returned nor offered to return the benefits which he or she received in consideration for his or her settlement agreement, the agreements have been ratified as a matter of law.

■ Plaintiffs also have ratified their agreements by waiting too long before disavowing their contracts. One who wishes to repudiate a contract on grounds that it was obtained under duress must do so within a reasonable amount of time. *Deren v. Digital Equipment Corp.*, 61 F.3d 1, 2 (1st Cir.1995) (retaining benefits of agreement for three and one half years constitutes ratification); *Abbadessa v. Moore Business Forms*, 987 F.2d 18, 23 (1st Cir.1993), *aff'g* No. 89–217–S, 1992 WL 471273 (D.N.H. Jan. 7, 1992) (even if plaintiff had acted under duress, failure to repudiate within seven months constitutes

ratification) *Mariotti v. Moore Business Forms*, 987 F.2d 18, 23 (1st Cir.1993), *aff'g* No. 89–218–S, 1992 WL 471263 (D.N.H. Jan. 7, 1992) (even if plaintiff had acted under duress, failure to repudiate within four months constitutes ratification); *In re Boston Shipyard Corp.*, 886 F.2d 451, 455 (1st Cir.1989) (one and a half years too long a delay for a duress challenge). If the allegedly coerced party does not contest the agreement within a reasonable time, the contract stands affirmed. *Boston Shipyard*, 886 F.2d at 455; *Teamsters Local No. 25 v. Penn Transportation Corp.*, 359 F.Supp. 344, 349 (D.Mass.1973). In this case, the time lapses between execution of the settlement agreements and attempted repudiation are as follows: Tasos 34 months, Ludwig 28 months, Walton 27 months, Shore 25 months, Dorn 11 months, and Campbell 31 months. None of these intervals is shorter than time periods held by this circuit to be unreasonable, thereby barring the right to repudiate the contract allegedly signed under duress.

Although as argued here, fear of retaliation may continue after actual threats are made, *Aurora Bank v. Hamlin*, 609 S.W.2d 486, 489 (Mo.App.1980), plaintiffs nonetheless had the burden to repudiate their respective agreements within a reasonable period of time. In spite of their fear, plaintiffs cannot treat their settlement agreements as binding and rescinded at the same time. See *Abbadessa*, 987 F.2d at 24. Eleven months to three years after they executed their contracts, received the benefits conferred upon them and thus ratified and affirmed their agreements, plaintiffs cannot rescind and repudiate them.

■ Finally, even if plaintiffs had not ratified their agreements with Astra, nearly all of their claims would have been barred by the exclusivity provisions of the Massachusetts Fair Employment Practices Act M.G.L. c. 151B or the Worker's Compensation Act M.G.L. c. 152. The Massachusetts Legislature, Massachusetts Supreme Judicial Court and Federal Courts with appropriate jurisdiction all have found that M.G.L. c. 151B provides the sole avenue for remedial relief on claims of sexual harassment against a

Massachusetts employer. See Mass. Gen. L. ch. 151B, §§ 4, 5, 9 ("As to acts declared unlawful in section four, the procedure provided in [c.151B, § 5] shall, while pending, be exclusive and the final determination therein shall exclude any other action, civil or criminal, based on the same grievance of the individual concerned.") (emphasis added); *Green v. Wyman–Gordon Co.*, 422 Mass. 551, 555, 664 N.E.2d 808, § 811 (1996) ("M.G.L. c. 151B remedies and procedures are exclusive and bar plaintiff's [sexual harassment] claim pursuant to M.G.L. c. 214, § 1C."); *Guzman v. Lowinger*, 422 Mass. 570, 571, 664 N.E.2d 820, 821 (1996) ("Where M.G.L. c. 151B applies [an employer with more than six employees], its procedural prerequisites may not be bypassed by reconstituting a sexual harassment claim as a violation of the Massachusetts Civil Rights Act M.G.L. c. 12, § 11I, Massachusetts Equal Rights Act M.G.L. c. 93, § 102, or as a new common law claim."); *Charland v. Muzi Motors, Inc.*, 417 Mass. 580, 586, 631 N.E.2d 555, 559 (1994) ("M.G.L. c. 151B provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections, and plaintiff's failure to adhere to requirements of M.G.L. c. 151B required dismissal of complaint."); *Choroszy v. Wentworth Institute of Technology*, 915 F.Supp. 446, 451 (D.Mass.1996) (wrongful termination claim due to discrimination barred by exclusivity provision of M.G.L. c. 151B); *Clarke v. Kentucky Fried Chicken of Calif., Inc.*, 57 F.3d 21, 23–24 (1st Cir.1995) (any claim of sexual harassment in the workplace must be brought pursuant to the procedures of M.G.L. c. 151B, or plaintiff forfeits any entitlement to judicial review). Since plaintiffs did not file their complaints pursuant to M.G.L. c. 151B, their respective claims of wrongful termination, civil conspiracy, intentional interference with contractual relations and violations of M.G.L. c. 12, § 11I, all of which are grounded in their general claims of sexual harassment, are barred by the exclusivity provision of M.G.L. c. 151B and must be dismissed.

■ The Worker's Compensation Act M.G.L. c. 152 provides the· exclusive remedy by which an employee can recover damages for personal injuries sustained in the course of and arising out of his or her employment. *Green v. Wyman–Gordon Co.*, 422 Mass. 551, 558, 664 N.E.2d 808, 813 (1996) (exclusivity provision of M.G.L. ch.152 barred common-law claims for intentional and negligent infliction of emotional distress); *Doe v. Purity Supreme, Inc.*, 422 Mass. 563, 565, 664 N.E.2d 815, 818 (1996) (plaintiff's claims of negligence, assault and battery and intentional and negligent infliction of emotional distress arising from sexual harassment and rape are barred by the exclusivity provision of Worker's Compensation Act, M.G.L. c. 152); *Foley v. Polaroid Corp.*, 381 Mass. 545, 548–49, 413 N.E.2d 711, 713–14 (1980) (intentional infliction of emotional distress barred by exclusivity provision of M.G.L. c. 152). M.G.L. c. 152, § 24 allows employees to recover for [personal] injuries which are shown to have arisen out of and in the course of employment. Personal injuries are defined as "mental or emotional disabilities where a significant contributing cause of such disability [is] an event or series of events occurring within the employment." Mass. Gen. L. ch. 152, § 1(7A). Since all of the personal injuries for which plaintiffs seek to recover "arose out of" and were "in the course of" employment, plaintiffs' claims of intentional infliction of emotional distress and assault and battery are barred by the exclusivity provision of M.G.L. c. 152 and therefore dismissed.

■ The Worker's Compensation Act, however, "does not cover injuries from common law torts such as defamation [ ], which are intended to protect against harm other than injury to mind or body." *Wyman–Gordon*, 422 Mass. at 560, 664 N.E.2d at 814. "[D]efamation, being injury to reputation, irrespective of any physical or mental harm, was not the type of personal injury contemplated by M.G.L. c. 152." *Foley*, 381 Mass. at 552, 413 N.E.2d at 715. Thus plaintiffs' defamation count is not barred by either M.G.L. c. 152 or M.G.L. c. 151B. Nevertheless, the defamation claim must be dismissed because plaintiffs have failed to state a claim. The Massachusetts Supreme Judicial Court has stated that defamation traditionally is a disfavored action, and that "courts have applied a stricter standard to complaints for defama-

tion by requiring defamation plaintiffs to plead the elements of their claims with specificity in order to survive a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)." See *Eyal v. Helen Broadcasting Corp.*, 411 Mass. 426, 432 n. 7, 583 N.E.2d 228, 231 n. 7 (1991); *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 728 n. 6 (1st Cir.), *cert. denied*, 504 U.S. 974, 112 S.Ct. 2942, 119 L.Ed.2d 567 (1992) ("a defendant is entitled to knowledge of the precise language challenged as defamatory, and the plaintiff therefore is limited to its complaint in defining the scope of the alleged defamation"). To survive a motion to dismiss, a defamation plaintiff must plead: (1) the general tenor of the libel or slander claim, along with the precise wording of at least one sentence of the alleged defamatory statement(s); (2) the means and approximate dates of publication; and (3) the falsity of those statements. *Pattison v. Town of South Hadley*, No. 92–12378–Z, 1993 WL 343675 (D.Mass. Aug.30, 1993); See *Eyal*, 411 Mass. at 431–34, 583 N.E.2d at 231–33; See *White v. Spence*, 5 Mass.App.Ct. 679, 685–86, 369 N.E.2d 731, 735 (1977). The elements of a defamation claim include (1) a false and defamatory communication (2) of and concerning the plaintiff which is (3) published or shown to a third party. *McAvoy v. Shufrin*, 401 Mass. 593, 597, 518 N.E.2d 513, 517 (1988). Words may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn or ridicule, or tend to impair his or her standing in the community. *Poland v. Post Publishing Co.*, 330 Mass. 701, 704, 116 N.E.2d 860, 863 (1953). Defamatory words are "of and concerning" a plaintiff if "the plaintiff can show that either the defendant intended its words to refer to the plaintiff and that they were so understood, or that the defendant's words reasonably could be interpreted to refer to the plaintiff." *New England Tractor–Trailer Training of Conn., Inc. v. Globe Newspaper Co.*, 395 Mass. 471, 483, 480 N.E.2d 1005, 1012 (1985). To be published, the defamatory statement need only be heard by a third party; extrinsic facts must be alleged showing that a third person other than the person libeled understood it to refer to him or her. *Brauer v. Globe Newspaper Co.*, 351 Mass. 53, 56, 217 N.E.2d 736, 739 (1966). Plaintiffs allege that Astra's executives made "false and disparaging statements regarding the circumstances under which the plaintiffs were terminated by Astra, including statements that the plaintiffs were terminated for poor performance." They also allege that Astra "disparaged the plaintiffs by continuing to deny that Bildman and his cohorts were engaged in any wrongful conduct, particularly after the Business Week article was published." For purposes of this motion Astra's alleged statements that plaintiffs were "terminated for poor performance" are viewed as "false and defamatory" because if they were made they would indeed "tend to impair standing in the community". However, plaintiffs fail to state a claim of defamation with the requisite level of particularity because they make no allegations as to the means or publication of the statements. They do not allege that anyone in particular made the statements nor that anyone in particular, other than the plaintiffs, heard them. Furthermore, Astra's denial of wrongdoing in the face of the Business Week article does not constitute a claim of defamation. In light of the fact that plaintiffs were neither named nor described in the article, Astra's statements in that context were not specifically "of and concerning" the plaintiffs, and thus were not particularly harmful to the reputations of the plaintiffs.

In sum, the complaint is dismissed except as to count five for defamation, as to which the complaint will be dismissed unless within forty-five (45) days plaintiffs file an amended complaint stating a claim with the requisite particularity.

It is so ordered.